Thomas W. TOLAND, Plaintiff,

v.

William J. McCARTHY et al.,
Defendants.

Civ. A. No. 77–2774–K.

United States District Court,
D. Massachusetts.

Feb. 27, 1980.

John P. Flynn, Murphy, Lamere & Murphy, Braintree, Mass., for plaintiff.

James T. Grady, Grady & McDonald, Gabriel O. Dumont, Boston, Mass., for defendants.

## MEMORANDUM

KEETON, District Judge.

### I.

The plaintiff filed this action in a state court seeking review of a decision by the defendants, as Trustees of the New England Teamsters and Trucking Industry Pension Fund ("Fund"), denying plaintiff's ap-

plication for a "Normal Pension" upon "Early Retirement," in 1976. Defendants, as trustees of a "pension plan" within the meaning of the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001 *et seq.*, removed to this court, invoking jurisdiction under 29 U.S.C. § 1132 and 28 U.S.C. § 1441.

The case was tried before the court without a jury, and memoranda were submitted by the parties both before and after the close of the evidence. Having considered the evidence and the arguments, the court makes the findings of fact stated in Parts II and III of this memorandum. Conclusions of law are stated in Parts IV and V.

## II.

It is undisputed that plaintiff met most of the requirements for a pension. He was over sixty years of age and had been employed in recent years for a "Contributing Employer," who had made contributions to the Fund on his behalf as an employee where employment was in a job classification covered by the collective bargaining agreement between the employer and the Excavating and Building Material, Chauffeurs and Helpers Local Union No. 379, a/w International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America ("Local 379"). See Paragraphs A–F *infra*. It is also undisputed that if the plaintiff is entitled to a Normal Pension (available after 25 years of Credited Service), the amount of his pension benefit is to be $315 per month, retroactive to August 1, 1976, payable for one hundred twenty consecutive months. Plaintiff's Proposed Findings, ¶ 56, uncontested. The Trustees rejected his claim, however, apparently on the theory that during a period of many years for which he claimed "Credited Service" he was not in "Covered Employment" because he was a salaried supervisor rather than a production employee. The controversy centers on whether he is to be credited for years of service before he joined the union, and Local 379, in June 1972; this, in turn, depends on whether he was during some or all of those years a "supervisor" rather than a production employee.

## A. The Plan

The Rules and Regulations for the Fund applicable to this case are published in the New England Teamsters and Trucking Industry Pension Plan ("Plan"), effective November 1, 1973. Among the provisions of the Plan are the following:

(1) Article V requires that an applicant for an Early Retirement Pension must establish that he is a covered employee and that he has at least 15 years of Credited Service for a Reduced Pension and 25 years of Credited Service for a Normal Pension. The Plan, Joint Ex. 1, pp. 5, 7, 33, 34.

(2) "In general, an employee receives credit toward his pension for all years of employment in the industries covered by the Pension Plan. All employment on and after an employer first started to contribute to the Fund for the employee is called Future Service. All previous employment is called Past Service. The combined amount is called Credited Service." The Plan, Joint Ex. 1, p. 21. See also *id.*, Article I, Sections 6–11, pp. 28–29.

(3) "An employee receives credit for each year of employment prior to the first month for which contributions began if during the year for which credit is sought:

1. his employment was in a job classification and at a place of business covered by a collective bargaining agreement with a participating Local Union, and

2. the employer subsequently became a Contributing Employer to the Pension Fund, and

3. he worked 135 days in the year." The Plan, Joint Ex. 1, p. 21.

(4) "It is recognized that many employees do not remember their exact dates of employment in past years and do not have ready 'proof' of employment. The Fund Office will obtain this information by requesting from Social Security its employment record for each pension applicant. This record, which goes back to 1937, will then be used as part of the proof of past employment. Each employer is also asked to verify the employment period and the

job classification of employment." The Plan, Joint Ex. 1, p. 21.

(5) "Past Service Credit is also granted for periods of employment with an employer who went out of business if the Trustees, in their sole discretion, are satisfied that the employer would have become a Contributing Employer if he had continued in business. This is tested by whether other employers in the same industry and in the same area are now Contributing Employers. . . ." The Plan, Joint Ex. 1, p. 21. See also *id.*, Article II, pp. 29–30, and Article III, Section 3, p. 31.

### B. Plaintiff's Employment History

Plaintiff's employment history from 1937 through 1975, reflected in Social Security records, was as follows:

| | |
|---|---|
| 1937–1940 | Employed in Boat Yards in Newburyport, Quincy, Medford, Boston, and East Braintree, Mass. |
| 1940–1946 | Employed by Bethlehem Steel Co. |
| 1946–1970 | Employed as a millman by successive companies owned principally by Otis Armstrong, as follows: |
| 1946–1949 | Modern Builders |
| 1949–1957 | Modern Builders Supply Corporation |
| 1957–1970 | Modern Builders Supply Co., Inc. |
| 1970–1972 | Employed by General Builders Supply Co. |
| 1972–1975 | Employed by General Millwork & Lumber, Inc. |

All of plaintiff's changes of employers between 1946 and 1975 were incident to changes of the ownership and name of the business rather than plaintiff's leaving one employment for another. Defendant's Ex. 5; testimony of Otis Armstrong and plaintiff. Plaintiff was the first employee of Modern Builders. Defendant's Proposed Findings, ¶ 2, uncontested.

### C. Employers

In passing upon the applications of other employees for pensions, the defendants, exercising their discretion in accordance with the provisions recited in Part II–A–5 *supra*, determined that the following employers, with respect to the periods indicated, would have become Contributing Employers had they continued in business:

| | |
|---|---|
| 1946–1949 | Modern Builders |
| 1949–1957 | Modern Builders Supply Corporation |
| 1957–1970 | Modern Builders Supply Co., Inc. |

Defendant's Ex. 5A, 5B, and handwritten notations thereon as explained in the testimony of Helen Debreceni; also handwritten notations on Defendant's Ex. 5 as explained in the testimony of Helen Debreceni, showing that recognition of these previous employers was "approved 5/1975 meeting," which was explained by the witness as referring to the fifth meeting of the Trustees in 1975.

No evidence has been produced that any employer of the plaintiff during 1946–1970—that is, Modern Builders, Modern Builders Supply Corporation, and Modern Builders Supply Co., Inc.–was, in the language of the last sentence of Part II–A–4 *supra* –"asked to verify the employment period and the job classification of employment."

Otis Armstrong was the principal owner of Modern Builders (1946–1949), Modern Builders Supply Corporation (1949–1957), and Modern Builders Supply Co., Inc. (1957–1970). He appeared as a witness in the trial before this court and would have been readily available to be asked by defendants "to verify the employment period and the job classification of employment" of the plaintiff. No evidence has been produced that he was asked to do so.

In 1970, Otis Armstrong sold Modern Builders Supply Co. to General Builders Supply Co. The company remained at the same location on Willard Street in Quincy, Massachusetts. (Testimony of plaintiff and Otis Armstrong and Plaintiff's Proposed Findings, ¶ 16, uncontested.)

### D. The Union

On May 20, 1970, the National Labor Relations Board certified the Excavating and Building Material, Chauffeurs and Helpers Local Union No. 379, a/w International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America ("Local 379"), as the representative for purposes ·of collective bargaining with respect to rates of pay, wages, hours of employment and other conditions of employ-

ment for all production and maintenance employees of General Builders Supply Co. at its 258 Willard Street, Quincy, Massachusetts location, including truck drivers but excluding office clerical employees, salesmen, guards, professional employees and supervisors as defined in the Act. (National Labor Relations Board Certification Case Number 1–RC–11, 047) (Plaintiff's Proposed Findings, ¶ 19, uncontested.)

The plaintiff was not permitted to vote in the NLRB supervised election. Defendant's Proposed Findings, ¶ 6, uncontested.

E. The Collective Bargaining Agreement

In January, 1971, General Builders Supply Co. and Local 379 executed a collective bargaining agreement (Joint Ex. 2A). In 1972, another change of the business organization occurred and General Builders Supply Co. was succeeded by General Millwork and Lumber, Inc. In September 1972 and annually thereafter General Millwork and Local 379 executed collective bargaining agreements (Joint Ex. 2B, 2C, 2D, 2E). Each of these Agreements included the following provisions.

Article I

... the Employer agrees to recognize the Union as the bargaining agent for all production and maintenance employees employed by the Employer at its yard at 258 Willard Street, Quincy, Massachusetts, ... but excluding ... supervisors as defined in the National Labor Relations Act as amended.

Article III

... All present employees who are not members of the Union ... shall become and remain members in good standing of the Union as a condition of employment on and after the thirty–first day following ... the effective date of the Agreement ....

Article IV

It is agreed by the Employer that no foreman or salaried officer in its employment shall work or take the place of employees covered by this Agreement ....

Article VII

... the Employer agrees to make payments to the New England Teamsters and Trucking Industry Pension Fund for each and every employee performing work within the scope of and/or covered by this collective bargaining agreement, ....

F. Remittances for and Membership of the Plaintiff

Employer Remittance Reports submitted to the Fund by General Millwork and Lumber Co., Inc., show that contributions were made to the Fund on behalf of the plaintiff from September, 1972 through July, 1975. These contributions were received and retained without objection.

The President of Local 379 certified, in a document submitted to the Fund in or about August, 1975, that plaintiff's initiation date in the union was June, 1972, and that he remained at all times thereafter a member in good standing.

G. The Application, Communications About It, and Trustees' Minutes

Plaintiff's application was dated 2/17/75, stating the intended retirement date as 1/30/76.

By letter of October 28, 1975, the Fund Manager advised plaintiff: "You do not qualify for a pension from this Fund for the following reasons:

You were not in Covered Employment and have less than 15 years of Credited Service.

Your Credited Service is as follows:

| | | |
|---|---|---|
| Past Service | – | 10 years, 0 months |
| Future Service | – | 2 years, 7 months |
| Total Credited Service | – | 12 years, 7 months |

Defendants' Ex. 8.

By letter of November 19, 1975, Paul V. Walsh, Organizer, Local Union # 379, wrote to the Fund Manager questioning the determination reported in the letter of October 28, 1975 and advising:

I cannot figure how you arrived at a figure of ten years past service when in fact he started work for this company in 1947 when it was known as Modern Windows, which later became Modern Builders which later became General Builders which was organized in 1971.

Mr. Toland was not originally considered part of the bargaining unit. At a subsequent date it was decided that since he was performing the work of the bargaining unit man he must join the Union which he did in June, 1972.

Mr. Toland has always been a "working foreman" and was never considered a part of management.

Defendants' Ex. 9.

Trustees Minutes for 1975–15 (the fifteenth meeting in 1975), held December 4, 1975, include the following entry:

8. *Thomas W. Toland–A–13381–Local 379*

The Trustees rejected the applicant's claim for past service credit for periods of service with Modern Builders, finding that on the record the applicant was not performing work under the collective bargaining agreement.

Defendants' Ex. 11.

By letter of February 2, 1976, plaintiff again applied for pension benefits. Defendants' Ex. 13.

Trustees Minutes for 1976–1 (the first meeting in 1976), held February 9, 1976, include the following entry:

20. *Thomas W. Toland–PAA13381– Local 379*

This matter was before the Trustees at the December, 1975 meeting. The Trustees rejected the applicant's claim for past service credit for work with Modern Builders, on the grounds that the applicant was not performing work within the scope of the agreement. The Trustees reviewed a letter from the applicant and from the Local Union. After reviewing the additional statements furnished at this meeting, the Trustees reaffirmed their prior re-

jection of the claim for past service credit.

Defendants' Ex. 14.

### H. Evidence and Inferences about Plaintiff's Job Classification

Based on an examination of the documents shown to have been in the hands of the Fund at the time of the letter of October 28, 1975 (*see* ¶ s A–G *supra*, and Social Security records referred to herein), and based on the testimony of the Assistant Fund Manager, Helen Debreceni, at trial, the court finds that the Fund Manager was, in the letter of October 28, 1975, allowing Past Service credit for the 10 years (1947– 1956) while plaintiff was employed by Modern Builders (1947–1949) and by Modern Builders Supply Corporation (1949–1956) and was denying Past Service Credit for the period he was employed by Modern Builders Supply Co. Inc. (1957–1970) and General Builders Supply Co. (1970–1972).

The meaning of "Modern Builders" as used in the Trustees Minutes for meetings 1975–15 and 1976–1 (*see* Part G *supra*) is unclear. It cannot be determined by the court whether the Trustees were affirming the Fund Manager's determination reported in the letter of October 28, 1975, or instead were denying credit even for the 10 years for which credit was allowed as reported in that letter.

Apart from the plaintiff's Social Security records, discussed below, the following evidence that was before the defendants and Fund Manager might be considered by a factfinder as tending to support an inference that plaintiff was a salaried supervisor (a foreman and not a working foreman or leading man) rather than a covered employee for some period of his employment history:

(1) He was not permitted to participate in the NLRB supervised election in 1970. Part II–D *supra*. This might support the inference that he was a salaried supervisor in 1970.

(2) His pension application dated 7/17/75, stating the intended retirement date as 1/30/76, under "Job Classification" for all periods of service, 1946–75, contains the

hand–lettered entry, "Foreman." This might support the inference that he was a salaried supervisor throughout his work history for Modern Builders and all its successors, 1946–75, but standing alone it is an extraordinarily weak foundation for such an inference in the face of undisputed evidence that the term "foreman" is often used in the sense of "working foreman" or "leading man" rather than exclusively to describe a "supervisor" who is treated as a part of management and therefore not within "covered employment." [1]

(3) Reports regarding covered employees and contributions to the Fund on behalf of covered employees for the years from 1970 (when General Builders Supply Co. succeeded Modern Builders Supply Co., Inc.) until September, 1972 (when remittances to the Fund on plaintiff's behalf were commenced, after his joining the Union in June, 1972) support the inferences that the plaintiff was not then regarded as being in covered employment and that no remittances to the Fund were being made on his behalf.[2] This body of evidence might support the inference that plaintiff was a supervisor from 1970 until June or September 1972.

In these three sources of evidence, however, whether viewed singly or in combina-

---

1. For this reason, if the Trustees Minutes were interpreted as rejecting the Fund Manager's allowance of Credited Service for the years 1946–57 and treating all service with "Modern Builders," 1946–70, as not covered, the court would be compelled to conclude that there was no "substantial evidence" (see Part IV infra) to support such a finding that the plaintiff was never in covered employment before he joined the Union in 1972.

2. Under cover letter dated June 7, 1973, the President of Teamsters Local Union No. 379 submitted requests for participation for the employees covered under the names of General Builders Supply Company and General Millwork and Lumber Company. (Defendants' Ex. 1a- 13 and Defendants' Proposed Findings, ' 13, uncontested.)

A report on a mimeographed form containing at the top of the page the Fund name and its New York address, dated December 1, 1971, and submitted to the Fund (as stated by a mimeographed part of the form) "on behalf of Teamsters Local Union 379" by General Builders Supply Co. listed "William Tolan" as an employee and in the column designated "Years of Employment in Type of Work Covered by Collective Bargaining Agreement" had opposite his name the entry, "NONE." On the reverse side of this document is a Fund stamp containing the inscription "Received JUN 11 1973." Defendants' Ex. 1c.

A report on the same mimeographed form, showing a typed date September 1, 1972, and a typed "General Millwork & Lumber Co., Inc." as the employer, otherwise filled in entirely by handwriting, and containing no signature or other entry to indicate who prepared it, was stamped on the reverse side "Received JUN 8 1973" by the Fund. This document lists "William Tolan" and, opposite his name in the column for years of employment, "25 YEARS." Defendants' Ex. 1e. It is unclear who submitted this report. Defendants' Proposed Findings, ' 15, uncontested.

Employer Remittance Reports submitted to the Fund by General Builders Supply Co. do not show any pension contributions for plaintiff (Defendants' Ex. 2), and no such contributions were made (Defendants' Proposed Findings, ' 18, uncontested.)

Employer Remittance Reports submitted to the Fund by General Millwork and Lumber Co., Inc., in which entries for all other employees are typed, show a hand–lettered addition of the name "W. Toland" and contributions based on 40 hours per week for every payroll week ending in the months of September–December, 1972. Plaintiff's name does not appear on the forms submitted for August 1972. Defendants' Ex. 3. Employer Remittance Reports available to the Fund showed that contributions had been made to the Fund by General Millwork and Lumber Co., Inc. on behalf of the plaintiff from September, 1972 through July, 1975. Plaintiff's Proposed Findings, ' 40, uncontested. These contributions were received and retained without objection. Id., ' 41, uncontested.

On August 7, 1973, General Millwork and Lumber Company made retroactive payments to the New England Teamsters and Trucking Industry Pension Fund covering the contributions it owed on behalf of its employees under the terms of its collective bargaining agreement with Teamsters Local Union No. 379. These contributions covered the period September 1, 1972 to July 31, 1973. (Defendants' Ex. 3 and Defendants' Proposed Findings, '' 19, uncontested.)

This period 1970–September 1972 was the period referred to in the Union Organizer's letter of November 19, 1975, stating:

Mr. Toland was not originally considered part of the bargaining unit. At a subsequent date it was decided that since he was performing the work of the bargaining unit man he must join the Union which he did in June, 1972.

tion, no evidence can be found to support an inference that plaintiff shifted from an hourly worker in "covered employment" to a position as salaried supervisor *in 1957.* Thus, the conclusion reported in the Fund Manager's letter of October 28, 1975, disqualifying the plaintiff for a period commencing in 1957, appears to be unsupported by any evidence other than the Social Security records. These records show plaintiff's earnings for 1947–1956 to have been amounts not in even dollars and earnings 1957–1972 to have been uniformly in even dollar amounts for each quarterly period. Defendants' Ex. 5.

The conclusion is inescapable that the Fund Manager gave decisive weight to an inference that plaintiff was a salaried employee in 1957–70 because his earnings for every quarter were reported in even dollar amounts. Standing alone, the Social Security records do not constitute substantial evidence that the plaintiff became a "supervisor" in 1957. Moreover, drawing such an inference from the evidence of even–dollar reports of quarterly earnings commencing in 1957 cannot be permitted in view of the Fund Manager's and the Trustees' recognition that the plaintiff was a covered employee, not a supervisor, during another period when plaintiff was paid by the hour but his Social Security records show even–dollar quarterly earnings. It is undisputed that he was paid by the hour by General Builders Supply Co. and General Millwork & Lumber, Inc., 1970–74 and thereafter. Uncontested parts of Plaintiff's Proposed Findings 16–17, 25. Social Security records for this period show even dollar figures for his earnings. Defendants' Exhibit 5. These undisputed facts discredit any inference that, because Social Security records show even dollar earnings for 1957–70, plaintiff must have been a salaried supervisor rather than an hourly covered worker during that period.

### III.

Apart from the evidence analyzed in Part II–H *supra*, there was no evidence before the Trustees and the Fund Manager, and none before the court at trial, to support a finding that in any of his employments from 1946 through 1975 the plaintiff ever had a position in which his assigned work was not primarily millwork and other production work of the type covered by Article I of the Agreements identified in Part II–E, and with respect to which in Article IV of each Agreement the employer agreed "that no foreman or salaried officer in its employment shall work or take the place of employees covered by this Agreement . . . ." No evidence was before the Trustees, and none has been presented in this trial, that would support a finding that the plaintiff was a "supervisor" as defined in the National Labor Relations Act, 29 U.S.C. § 152(11).[3]

### IV.

Defendants in this case have properly invoked jurisdiction under 28 U.S.C. § 1441 (removal on the basis of "arising under") and 29 U.S.C. § 1132 (action by a participant in a pension fund subject to ERISA, enacted in 1974). It is unnecessary to consider whether the court might have had jurisdiction, had ERISA not been enacted, under the Labor Management Relations Act § 301, 29 U.S.C. § 185; in support of such jurisdiction *see, e. g., Rehmar v. Smith,* 555 F.2d 1362 (9th Cir. 1977). It is appropriate, in any event, to look to the body of federal common law fashioned under LMRA § 301 for analogies that may be useful in relation to issues as to which little guidance is as yet available in precedents bearing directly upon applications of ERISA. *Taylor v. Bakery & Confectionery Union and Industry International Welfare Fund,* 455 F.Supp. 816 (E.D.N.C.1978). *See also Caw-*

---

**3.** "(11) The term 'supervisor' means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority *is not of a merely routine or clerical nature, but requires the use of independent judgment." See also* Part IV–B *infra.*

*ley v. N.M.U. Pension and Welfare Plan*, 457 F.Supp. 301 (S.D.N.Y.1978). This analogous body of law strongly supports the conclusion that the court's function is to determine whether the denial of an individual application (from plaintiff) for pension benefits was, as stated in *Rehmar*, 555 F.2d at 1371, "arbitrary, capricious, or made in bad faith, not supported by substantial evidence, or erroneous on a question of law."[4]

The decision of the defendants, denying plaintiff's claim for pension benefits, must be overturned for the reasons explained in Parts A and B below.

### A. Duty to Develop Available Evidence

Defendants, as Trustees of the Pension Plan, had a duty to take an initiative themselves to cause reasonably available evidence–that is, evidence substantially bearing upon the plaintiff's claim and available through reasonable efforts–to be developed and considered in the decisionmaking process.[5] Their determination that they should proceed to deny plaintiff's application without having caused the reasonably available evidence to be gathered and placed before them for consideration was an error of law by reason of which their denial of his application was "erroneous on a question of law."

■ One basis for holding that the trustees had a duty to assure development, by them or at their direction, of reasonably

available evidence bearing upon the plaintiff's claim is grounded in the terms of the published Plan. As noted in Part II–A–4 *supra*, in that publication the trustees had declared it to be their practice that each employer for past years "is also asked to verify the employment period and the job classification of employment." Having thus represented to the plaintiff and others that this inquiry is regularly made, they were not free to omit it in this case. In fact, no such inquiry was made. *See* Part II–C *supra*. In view of the ready availability of the former employer, Otis Armstrong–*see* Part II–C *supra*–and the nature of his probable response as indicated in his testimony in this trial, this breach of duty to inquire was material and, standing alone, would require that the court overturn the trustees' decision denying plaintiff's claim.

A second basis for holding that the trustees had a duty to assure development and consideration of reasonably available evidence bearing upon the plaintiff's claim is grounded in the fundamental character of the decisionmaking procedure, both by reason of Congressional mandate and by reason of action of the trustees.

■ ERISA mandates that the trustees of a pension fund function as fiduciaries with special obligations to assure equity and fairness to employee participants in the plan they administer.[6] Although the Plan

---

4. Contrary to the position asserted in Defendants' Proposed Conclusions of Law, this case does not present an issue as to whether eligibility requirements established by the Trustees are to be overturned. For cases involving challenges to the validity or interpretations of eligibility requirements see, *e. g., Rueda v. Seafarers International Union of North America, AFL–CIO*, 576 F.2d 939 (1st Cir. 1978) (challenge to trustees' interpretation of eligibility requirement); *Johnson v. Botica*, 537 F.2d 930 (7th Cir. 1976) (review of a claim that an eligibility requirement "structurally violated" pre–ERISA federal labor law).

5. The court must therefore reject defendants' argument (Defendants' Post–trial Memorandum, p. 2) that in determining whether the decision of the Trustees shall stand this court must review "solely the information available to the trustees at the time [of] their decision to deny the application." Defendants' memoran-

dum apparently uses "information available to the trustees" in the sense of "information before them" rather than a broader sense including information available to them had they made reasonable efforts to obtain it.

6. The Congressional findings recited in ERISA, 29 U.S.C. § 1001, include the following:

   (a) The Congress finds that the growth in size, scope, and numbers of employee benefit plans in recent years has been rapid and substantial; ... that the continued well–being and security of millions of employees and their dependents are directly affected by these plans; ... that owing to the lack of employee information and adequate safeguards concerning their operation, it is desirable in the interests of employees and their beneficiaries ... that disclosure be made and safeguards be provided with respect to the establishment, operation, and administration

under which plaintiff claims became effective November 1, 1973, and ERISA was enacted in 1974 and became effective in most respects on January 1, 1975, 29 U.S.C. § 1114, the defendants, as trustees of a pension plan governed by ERISA, are charged with fulfilling their fiduciary responsibilities to the plaintiff since he first filed his claim on July 17, 1975, stating his intended retirement date as January 30, 1976.

ERISA mandates that a plan incorporate claims procedures that accord with regulations of the Secretary of Labor. 29 U.S.C. § 1133.[7] The Plan under which plaintiff claims, Joint Ex. 1, does have provisions in the "Outline of Contents" on "How to Apply for Benefits," *id.* at 23–24, and in the "Complete Rules and Regulations" on "Applications and Proof," *id.* at 41. Article VII, Section 3 of the "Complete Rules and Regulations" provides:

> Action of Trustees
>
> The Trustees shall be the sole judges of:
>
> (a) the standard of proof required in any case
>
> (b) the application and interpretation of this Plan
>
> (c) entitlement to or amount of pension
>
> (d) the crediting of Future or Past Service

and the decisions of the Trustees with respect to any of the foregoing shall be final and binding on all parties. Wherever in the Plan the Trustees are given discretionary powers, the Trustees shall exercise such powers in a uniform and non–discriminatory manner.

█ It may be doubted that this provision, which was adopted before the enactment of ERISA, complies with § 1133 and the regulations adopted by the Secretary under the authority granted in that section.[8] Whether that be so, however, as well

> of such plans; . . . that owing to the inadequacy of current minimum standards, the soundness and stability of plans with respect to adequate funds to pay promised benefits may be endangered; . . . and that it is therefore desirable in the interests of employees and their beneficiaries, . . . that minimum standards be provided assuring the equitable character of such plans and their financial soundness.
>
> (b) It is hereby declared to be the policy of this Act to protect . . . the interests of participants in employee benefit plans and their beneficiaries, . . . by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions, and ready access to the Federal courts.
>
> . . . . .
>
> Section 1132 provides in part as follows:
>
> (a) A civil action may be brought–
>
> (1) by a participant or beneficiary–
>
> . . . . .
>
> (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan
>
> . . . . .
>
> (e)(1) Except for actions under subsection (a)(1)(B) of this section, the district courts of the United States shall have exclusive jurisdiction of civil actions under this subchapter brought by the Secretary or by a participant, beneficiary, or fiduciary. State courts of competent jurisdiction and district courts of the United States shall have concurrent jurisdiction

> of actions under subsection (a)(1)(B) of this section.
>
> . . . . .
>
> (g) In any action under this subchapter by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party.

7. "Claims procedure
> In accordance with regulations of the Secretary, every employee benefit plan shall–
>
> (1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and
>
> (2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim."

8. 29 C.F.R. § 2560.503–1(f)(4) requires that notification to the claimant of a decision denying a claim contain
> (4) Appropriate information as to the steps to be taken if the participant or beneficiary wishes to submit his or her claim for review. § 2560.503–1(g)(1) requires that every plan establish and maintain a procedure by which a claimant or his duly authorized representative had a reasonable opportunity to appeal a denied claim to an appropriate named fiduciary or to a person designated by such fiduciary, and under which a full and fair review of the claim and its denial may be obtained. . . .

as the consequences of such noncompliance, need not be determined in the present case. In any event, it is clear that the defendants, as trustees of a pension plan governed by ERISA, had a fiduciary obligation to the plaintiff not alone in relation to the general administration of the fund but also in relation to the fairness and adequacy of the procedure for deciding his claim for pension benefits.

Both ERISA and the Secretary's regulations adopted thereunder in relation to claims procedures envision a procedure appropriately characterized as nonadversarial. *See, e. g., Taylor v. Bakery and Confectionery Union and Industry International Welfare Fund*, 455 F.Supp. at 820. The procedure used by the defendants in this case is consistent with that Congressional objective. Although the trustees' procedure had at least a small element of adversarial quality, in that they received and considered the union organizer's representations advocating allowance of plaintiff's claim (*see* Part II–H *supra*), it was primarily nonadversarial in nature. The plaintiff's claim was not presented by an advocate, and plaintiff was neither invited nor expected to have his claim presented before them in this fashion.

In a decisionmaking procedure that is primarily adversarial, even though the decisionmaker may take an initiative in causing claims and defenses to be more fully developed in ways not suggested by the opposing advocates, the decisionmaker has no duty to do so. It is appropriate for the decisionmaker to rely upon the advocates to develop the claims and defenses fully.

In contrast, in a nonadversarial proceeding, where no advocates are available to perform this function of assuring that reasonably available evidence and arguments are presented, either (a) the responsibility of assuring that the case is fairly developed and that relevant evidence and arguments are not entirely overlooked must necessarily fall upon the decisionmaker or (b) it must be contemplated that a decision may be made on whatever evidence happens to be before the decisionmaker, whether or not that is all the reasonably available evidence.

In some contexts, no doubt, the parties affected may lawfully agree to decisions made on the evidence before the decisionmaker. For example, participants in a professional sporting event may agree that the decision of the officials will be made on the basis of what they saw, with little or no opportunity for advocacy and no opportunity to review the instant replays that are promptly shown to the television audience. Similarly, even if the agreement provides for an appeal of sorts, it may prescribe that both the primary and appellate decisions be made without benefit of the testimony of readily available witnesses, as when an appeal is taken from the call of the plate umpire to the first– or third–base umpire in baseball. These are contexts in which the parties place a higher value on having decisions that are quick and final than on having decisions that are as nearly consistent with what truly happened as it is humanly possible to make them.

In other contexts, as well as in professional games, the parties to an agreement may tailor to their own needs and interests the characteristics of their private decision-making system. They may dispense with taking evidence and with provisions for the development of evidence, whether by advocates or at the initiative of the decisionmak-

---

§ 2560.503–1(h)(3) provides that the decision on review

shall be in writing and shall include specific reasons for the decision, written in a manner calculated to be understood by the claimant, as well as specific references to the pertinent plan provisions on which the decision is based.

The regulations promulgated by the Secretary envision that the review procedure may make use of the grievance and arbitration mechanism of a collective bargaining agreement. § 29 C.F.R. § 2560.503–1(b)(2).

The regulations do not include any specifications that could be read as requiring an adversarial hearing. Nor do they define any duty regarding development of reasonably available evidence bearing upon an individual claim.

er. Within limits prescribed by law, they may dispense with review by courts, agreeing to be bound by the decision of an appraiser or an arbitrator. Certainly they are not bound to copy all or any of the procedures characteristic of adversarial trials in courts of law. The questions remain, however, whether the parties to the pension plan involved in this case meant to establish such a procedure and could lawfully do so. The provisions of the Plan referred to in Part II–A clearly demonstrate that they were more interested in having a decision that was consistent with the actual classifications of the jobs held in the past by an applicant for Past Service Credit than in a quick and unreviewable decision based on whatever documentary evidence happened to be in the hands of the trustees. Moreover, an attempt to provide for decisions based on less assurance of development of the reasonably available evidence would have been legally impermissible in view of the Congressional purpose and policy manifested when Congress enacted ERISA, including its explicit statement of purpose and policy (see n. 6 supra), its requirement of claims procedures (see n. 7 supra), and its provisions for judicial review (see n. 6 supra).

■ Congress may reasonably be understood to have expected that courts would turn for analogies to the body of law regarding judicial review of decisions of administrative agencies, even though that body of law is not directly in point in cases of review of the decisions of a private institution such as the trustees of an employee pension fund. In that body of law are precedents supporting the principle that, when a claimant is unrepresented and the evidence before the decisionmaker is apparently incomplete, the decisionmaker has a responsibility to see that the evidence is developed before a decision against the claim is made. See Currier v. Secretary of Health, Education and Welfare, 612 F.2d 594 (1st Cir. 1980).[9] The objective of assuring fair decisionmaking that underlies this rule regarding agency decisionmaking seems equally applicable to the decision of trustees of an employee pension fund upon individual applications for pension benefits.

In providing for judicial review, Congress implied at the least that review should be principled. Of course, this conclusion leaves many questions unanswered. Both the defendants, as Trustees of the Fund, and this court, in reviewing their decision, have been required to act with relatively little explicit guidance about what procedures trustees of a "pension plan" must or may use in "hearing" and "deciding" to grant or deny an individual's application for pension benefits. In this context, it may be permissible for trustees to use procedures so informal that analogies to adversary proceedings are inapt. The fact remains, nevertheless, that whatever the procedures may be, and however formal or informal, they must satisfy basic principles of fair procedure for determining the adjudicative facts on the basis of which a claim is allowed or denied. That much is surely implied as a part of any principled review. In the absence of an explicit Congressional directive, it seems most consistent with the purpose and policy manifested by Congress in ERISA generally, and more particularly in providing for judicial review of the denial of pension claims, that the review extend to determining whether the private institutional decisions under review were made not only upon substantial evidence but also after fair development of the reasonably available evidence bearing upon the claim.

---

**9.** It might be argued that *Currier* is distinguishable because, as the First Circuit observed, 612 F.2d 594:

> We emphasize that we do not see such responsibilities arising in run of the mill cases, but here appellant seems obviously mentally impaired to some degree, having been found unemployable by the Air Force and effectively so by his principal civilian employer and having been diagnosed as having a non–trivial psychiatric condition.

This ground of distinction is offset, however, by the fiduciary relationship of the trustees toward the claimant in the present case.

## B. Finding Not Supported by Substantial Evidence

█ In view of the evidence before the defendants and the inferences that might be drawn from it, as explained in Part II–H *supra*, the finding of the defendants that plaintiff was not performing work "under the collective bargaining agreement" or "within the scope of the agreement," must be construed as a finding that he was a "supervisor" rather than a "production employee" at least in 1957–72 and perhaps in 1946–57 as well. This finding is not supported by substantial evidence.

Even if the evidence were found to be sufficient to support an inference that plaintiff received a straight salary, and even though that would be evidence properly to be considered, it is not alone sufficient to bring the employee within the classification of "supervisor" as defined in 29 U.S.C. § 152(11). *Filler Products, Inc. v. N.L.R.B.*, 376 F.2d 369 (4th Cir. 1967). *See also N.L.R.B. v. Quincy Steel Casting Co.*, 200 F.2d 293 (1st Cir. 1952); *GAF Corp. v. N.L.R.B.*, 524 F.2d 492 (5th Cir. 1975); *N.L.R.B. v. Orr Iron, Inc.*, 508 F.2d 1305 (7th Cir. 1975). Nor was there any other evidence before the defendants that would serve to fill this gap.

This conclusion is supported also by consideration of what Mr. Justice Frankfurter, delivering the opinion of the court in *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951), referred to as the court's obligation to respect the mood expressed by legislation as well as its specific mandates. *Id.* at 487, 71 S.Ct. at 463. The Court was there considering the duty of a Court of Appeals when reviewing orders of the National Labor Relations Board. The Court declared:

> Whether or not it was ever permissible for courts to determine the substantiality of evidence supporting a Labor Board decision merely on the basis of evidence which in and of itself justified it, without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn, the new legislation definitively precludes such a theory of review and bars its practice. The substantiality of evidence must take into account whatever in the record fairly detracts from its weight. This is clearly the significance of the requirement in both statutes that courts consider the whole record. . . .

*Id.* at 487–88, 71 S.Ct. at 464–465. The issue in the present case, involving a district court's review of private institutional decisionmaking, is distinguishable from the issue to which the Court thus spoke in *Universal Camera*, of course. In reciting the history of evolution of standards of judicial review, however, the Court observes, *id.* at 477, 71 S.Ct. at 459, that the Wagner Act had used the phrase "if supported by evidence" and the Court read "evidence" as "substantial evidence," meaning "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938). Thus, standards of review that incorporate a "substantial evidence" test have evolved from a history of both judicial and legislative concern for fair decisionmaking. Specific holdings in the application of a "substantial evidence" standard for review of administrative decisions "on the record," or "on the record as a whole," may not be assumed to be directly applicable to judicial review of the decision of trustees of a pension fund denying an application for benefits. They may nevertheless provide instructive analogies that deserve attention.

ERISA does not specify that the judicial review of a decision by trustees denying pension benefits be a review on "the whole record." As observed in Part IV–A *supra*, however, it does place fiduciary obligations upon the trustees in relation to claims procedures as well as fund administration, implying a duty to take an initiative to cause reasonably available evidence to be developed and considered. In this context, the "substantial evidence" standard is not satis-

fied when the trustees have not caused reasonably available evidence to be developed and considered. Even if the evidence before them might have, in an abstractly logical sense, supported a reasoned inference that the plaintiff was a "supervisor," a reasonable mind would not have accepted that inference without first taking into account whatever in the reasonably available evidence, in the language of *Universal Camera*, 340 U.S. at 488, 71 S.Ct. at 464, "fairly detracts from its weight." This conclusion is reinforced by the analogy to judicial review of the decision of an administrative law judge denying the social security claim of an unrepresented claimant, as to which the First Circuit has held that the rejection of the claim is not supported by "substantial evidence" when the record of available evidence is inadequately developed. *Currier, supra,* 612 F.2d at p. 598.

The trustees' finding that plaintiff was not performing work "under the collective bargaining agreement" or "within the scope of the agreement" was not supported by substantial evidence.

It follows that the decision of the defendants, as Trustees, must be overturned.

## VI.

A conference of counsel and the court will be scheduled for consideration of the following questions, which have not been fully addressed in the memoranda filed in the case:

(1) Should the court remand to the trustees for a new hearing upon plaintiff's claim for pension, or instead proceed by some other means to final resolution of this dispute? Should the court treat this case as one in which the fact question of plaintiff's job classification in 1946–72 should be determined in this court, on *de novo* review, on the grounds that the trustees' decision was "unwarranted by the facts," their action was "adjudicatory in nature," and their "factfinding procedures are inadequate," as those phrases are used in *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971)?[10] If so, were the parties trying the case on this theory when introducing evidence at trial? If not, should the court allow additional evidence to be received if offered by either party, before making a final disposition? If making a final disposition, should this court as factfinder, on *de novo* review, determine plaintiff's claim? Or should this court make a final determination only if there is only one resolution of the fact issue regarding plaintiff's job classification in 1946–72 that would be "warranted by the facts," and instead remand to the trustees if a factfinder might reasonably decide either way on the merits?

(2) Should attorney's fees be allowed under 29 U.S.C. § 1132(g)? The scheduled conference to consider these questions was continued on joint motion of the parties. Thereafter, by order entered May 8, 1980, this action was dismissed in accordance with a settlement agreement of the parties.

---

10. Of course *Overton Park* is not directly in point since it was concerned with review of a decision of an "agency" subject to the Administrative Procedures Act, and 5 U.S.C. § 701(b)(1)(E) makes clear that "agency" as there defined does not include "agencies composed of representatives of the parties or of representatives of organizations of the parties to the disputes determined by them." Thus, one aspect of the questions stated in the text above is whether this court should or should not be guided by analogies found in the body of law relating to judicial review in cases governed by the Administrative Procedure Act.