**James LAIRD, Plaintiff,**

v.

**METROPOLITAN LIFE INSURANCE COMPANY, Defendant.**

**No. 88 CV 2699.**

United States District Court, N.D. Ohio, E.D.

June 25, 1992.

Thomas A. McCormack, Joseph L. Motta, Cleveland, Ohio, for plaintiff.

Jeffrey D. Fincun, Connie D. Wymer, Weston Hurd Fallon Paisley & Howley, Cleveland, Ohio, for defendant.

## ORDER

BATTISTI, District Judge.

Before the Court is Plaintiff James Laird's motion for summary judgment. For the reasons set forth below, it is granted.[1]

## FACTUAL BACKGROUND

Plaintiff James Laird was hired as a tool maker by General Motors Corporation (GM) at its Coit Road Plant on January 5, 1960, and upon beginning work, became a member of the United Auto Workers, Local 45. Pursuant to a collective bargaining agreement between GM and the union, Plaintiff was a beneficiary of an employee welfare benefit plan, which came to be governed by the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001 *et seq.* Defendant Metropolitan Life (Metlife) is the claims administrator of this plan. Laird Aff. at 1; Kahler Aff. at 2–3.

On or about December 1, 1977, Laird applied for extended disability benefits based on an injury to his wrist. Although Metlife determined that Laird could perform some jobs despite his disability, he could not be placed into any of those jobs due to the seniority system in place at the plant. Under the terms of the plan, he was disabled. Accordingly, he began receiving extended disability benefits. Kahler Aff. at 4. In addition, on May 23, 1979, Laird's attending physician notified Metlife that he had developed poor vision in one eye. Kahler Aff. at 6. On January 30, 1980, the plant medical director notified Metlife that Plaintiff could not return to work because of medical restrictions. Again, under the terms of the plan, he was disabled. Accordingly, he continued to receive extended disability benefits. Kahler Aff. at 7.

On January 24, 1980, Laird began serving his sentence for a criminal conviction, unrelated to the present matter, at Chillicothe Correctional Institute (Chillicothe).

As early as January 30, 1980, Metlife was aware that Laird was or soon would be incarcerated. *See* Def. Ex. F. On February 1, 1980, GM wrote to Metlife to advise it that Laird would be incarcerated. Def. Ex. G. At that time, Metlife did not investigate any further regarding Laird's imprisonment. Kahler Dep. at 37. Although Metlife had been notified of Laird's incarceration, its computer system still listed his former address. *Id.* at 39. Hence, all correspondence was sent there. *Id.* at 37–39. As late as April 19, 1983, Metlife was attempting to correspond with Laird at his former address. Kahler Dep. at 61. By June 28, 1983, however, Metlife was sending letters to Laird at Chillicothe. Def. Ex. W.

Metlife mailed benefits checks for the months of March through July 1980, along with requests for medical information. Laird contends that he did not receive the requests for medical information.

**1.** Defendant's motion to file a reply brief is granted.

Metlife suspended benefits on August 1, 1980, due to lack of medical proof of continuing disability. Metlife did not have any discretion to terminate benefits because of incarceration. *Id.*

On October 6, 1980, Metlife sent a letter to GM seeking information about Plaintiff's status. Def. Ex. J.

Nothing further occurred until Metlife contacted GM with an inquiry about Laird's whereabouts, on May 20, 1982. Kahler Dep. 57–58.

Apparently after learning that Laird was at Chillicothe, Metlife inquired with officials there regarding his medical condition. It received the following response in a letter dated October 4, 1982:

Please be advised it would not be possible to provide a statement from all physicians that have treated Mr. Laird from August 1980 to present because some of the physicians are no longer on contract with the institution. Also, Mr. Laird has been seen outside the institution, and it would be difficult to obtain a statement from those physicians. Determination of disability is not our function. We can provide a medical summary of Mr. Laird's medical condition if that is sufficient. If not, *we would extend our facilities for a physician of your choice to come into this institution to examine Mr. Laird with notification,* stating the physician, the date, and time of arrival.

Pl.Ex. 8 (emphasis added). Metlife did not conduct an independent medical examination. Instead, it accepted a medical summary provided by Chillicothe. Pl.Ex. 9. The medical summary, from a P.V. Tanedo, M.D., medical director at Chillicothe, dated October 28, 1982, is reproduced in full in the margin.[2]

Laird was released from Chillicothe on September 26, 1983. At that time, he requested review of the decision to terminate benefits. GM also requested review. Kahler Aff. at 12. Metlife twice reviewed the claim and on both occasions denied the application. Metlife based its decision on lack of sufficient proof of continuing disability during the time Laird was incarcerated. In reaching its conclusions, Metlife reviewed reports from six physicians, but found that four of the six had not treated Laird during the relevant period, and the remaining two had examined him only once each. *See* Order of March 11, 1992. *See also* Def. Ex. CC.

Two internal memoranda produced by Defendant state that "[w]hile we can assume that if [Laird] was [totally disabled] before entering prison [and] was [totally

2. In answer to your recent medical request regarding [Laird], a review of the medical records shows that he was incarcerated on 2/11/80, [and] the physical examination at that time showed he had an injury to the left hand with fracture of left radius from an industrial accident in 1961, [and] right thumb injury from a shotgun accident. He was seen by the ENT doctor on 2/26/80 because of hearing loss complaint since accident in January 1980. He gave a history of noise exposure. Physical examination at that time shows the tympanic membranes are in tact and mobile—Weber test increase, Rine A increased to B256. His throat was within normal limits—his nose showed septal deviation. The impression was neurosensory hearing loss, [and] he requested a hearing test. Type of loss left [and] right showed both ears normal for speech. High decibel loss consistent with noise or trauma. He was seen by the orthopedic physician on 3/28/80 because old laceration of dorsum left wrist [and] repaired extension tendons in 1961. Also left shoulder pain, stiffness of neck since automobile accident in January. Physical examination showed neurologic examination normal in upper extremity, decreased range of motion of cervical spine, full range of motion left shoulder, but mild pain [and] click at 90 [degrees]. Cervical spine x-rays showed degenerative disc disease C4–C7. He recommended no heavy work with left arm [and] symptomatic treatment per sick call. After the hearing test was performed he was seen in the ENT clinic on 3/25/80 [and] it says the 55 year old white male with industrial noise exposure. Audiogram shows high tone sensorineural loss consistent with noise exposure—hearing in speech range is normal. He advised ear protection in noisy environment [and] yearly audiograms. He was seen again in the Orthopedic Clinic on January 16, 1981 for follow-up of neck [and] left shoulder pain. The impression was—degenerative cervical and lumbar disc disease [and] was placed on analgesics. Patient receiving Motrin four times a day [and] that is the only medication he is on. ¶ Trusting this information will be of assistance to you. ¶ Yours truly, /s/P.V. Tanedo, M.D., Medical Director

Pl.Ex. 9.

disabled] shortly after release that he must have remained [totally disabled] while in prison, we have no medical proof of such." They also conclude that benefits should be re-instated. Pl.Ex. 11. *See also* Pl.Ex. 19.

Both the Veterans Administration and the Department of Health and Human Services have determined that Laird is totally and permanently disabled. He has been found eligible for Social Security benefits. Pl.Ex. 10. Metlife was notified of these decisions. Def. Ex. X.

Plaintiff initially filed suit in the Court of Common Pleas for Cuyahoga County, but Defendant removed the action to this Court on July 25, 1988. In response to an order from the Court, Plaintiff amended his complaint on June 5, 1991, to more clearly state an ERISA claim. *See* Order of May 22, 1991. Defendant's motion for summary judgment was denied earlier. *See* Order of March 11, 1992. Plaintiff seeks judgment in an amount equal to benefits he would have received between August 1980 and November 1989, along with interest, attorney fees and costs.

## DISCUSSION

### I. STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ. Pro. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). *See also Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir.1989) (describing "new era" of summary judgment). "The moving party has the burden of showing the absence of genuine disputes over facts which, under the substantive law governing the issue, might affect the outcome of the action." *Harris v. Adams*, 873 F.2d 929, 931 (6th Cir.1989). However, "[n]ot every factual dispute between the parties will prevent summary judgment." *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir.1987). "The facts must

be such that if they were proven at trial a reasonable [fact-finder] could return a verdict for the non-moving party." *Id.*

At the same time, the non-moving party, in order to avoid summary judgment, must "present some significant probative evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial." *Id.* Furthermore, "[t]hroughout, all evidence and inferences will be read in a light most favorable to the non-moving party." *Sims v. Memphis Processors, Inc.*, 926 F.2d 524, 526–27 (6th Cir.1991). In sum, whether summary judgment is appropriate corresponds to whether trial is required.

### II. STANDARD OF REVIEW UNDER ERISA

When a claimant challenges an administrator's decision to deny benefits under ERISA, 29 U.S.C. § 1132(a)(1)(B), the Supreme Court has stated that a *de novo* standard of review applies, unless the plan expressly grants that administrator the discretionary authority to determine eligibility. In such instances, the arbitrary and capricious standard of review applies. *See Firestone v. Bruch*, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989); *Miller v. Metropolitan Life Insurance Co.*, 925 F.2d 979 (6th Cir.1991); Order of March 11 at 8–11. As already discussed, in this case, an arbitrary and capricious standard applies. The *Miller* court also warned that "[b]ecause an insurance company pays out to beneficiaries from its own assets rather than from the assets of a trust, its fiduciary role lies in perpetual conflict with its profit-making role as a business, and the conflict of interest is substantial." As a response, "application of the standard [of review] should be shaped by the circumstances of the inherent conflict of interest." *Miller*, 925 F.2d at 984.

Here, a motion for summary judgment is an appropriate device for resolving the litigation. Defendant's previous motion for summary judgment was denied because of uncertainty surrounding the availability of medical information about Plaintiff during his incarceration. At this point, the parties

agree on the relevant facts; there is no need for a trial. The fact pattern frames a single legal question: whether Defendant's decision to deny benefits was arbitrary and capricious where it had an opportunity to conduct a medical examination that would have been dispositive, but did not do so, while Plaintiff was unable to secure similar proof of his condition. In answering this question, only materials contained in the administrative record, the Laird file, should be used. *See Miller,* 925 F.2d at 986 (*citing Crews v. Central States, Southeast and Southwest Areas Pension Fund,* 788 F.2d 332, 336 (6th Cir.1986), *Perry v. Simplicity Engineering,* 900 F.2d 963, 966 (6th Cir.1990)).[3]

As an initial matter, however, Metlife has requested reconsideration of the decision that Laird exhausted his administrative remedies. The record discloses that when Laird was released from Chillicothe, his former plant and union local were no longer in operation. As a consequence, he was unable to pursue his claim further through the established procedures. In addition, Plaintiff complied with Defendant's instructions regarding review of his claim. *See* Order of March 11 at 6–8. Finally, Metlife's conduct following Laird's release, during the review process, is puzzling. Given Metlife's insistence that Laird provide medical proof concerning his condition during incarceration, which did not exist, and could not be established after the fact, it is unclear what purpose was served by the requests. The Court declines to follow Defendant's view regarding exhaustion.

### III. EVALUATION OF DEFENDANT METROPOLITAN LIFE'S DECISION

The parties agree that in this context the leading Sixth Circuit decision is *Miller,* 925 F.2d 979. Metlife relies heavily on a passage from the case that reads:

> [U]nder the terms of the Plan, the insurance company need not request an independent examination from one of its physicians unless the employee first submits

proof of continuing disability. The Plan's terms specify that provision of reasonably requested information is a condition precedent to the receipt of benefits and permit the company to require examinations and evidence at any point to demonstrate disability. Therefore, Metropolitan did not act unreasonably in refusing to reinstate benefits or schedule a second independent examination unless [P]laintiff first submitted further evidence of continuing disability.

*Id.* at 985–86. *See also* 29 U.S.C. § 1104 (fiduciary shall discharge its duties in accordance with documents of the plan).

The *Miller* case apparently involved the same plan under consideration here. The operative language is as follows:

> An Employee shall be deemed to be totally disabled only if the Employee is not engaged in regular employment or occupation for remuneration or profit and, on the basis of medical evidence satisfactory to the Insurance Company, the Employee is found to be wholly prevented, as a result of bodily injury or disease, either occupational or non-occupational in cause, from engaging in regular employment of occupation, for remuneration or profit, with the Employer at the plan or plants where the Employee has seniority.

Def. Ex. B, Part IX, § A at 12.

> The insurance company may require an applicant, as a condition of eligibility, to submit to examinations by a physician designated by it for the purpose of determining his initial or continuing disability.

Def. Ex. A, Art. II, § 8(e) at 42–43. *See also* Def. Ex. B., Part XI at 16. Metlife argues that it has followed the plan, and satisfied the arbitrary and capricious standard, because the plan refers to an independent medical examination in permissive rather than mandatory terms. Metlife may but need not arrange for an independent medical examination.

A careful reading of the *Miller* decision and the plan reveals that neither contemplates that Metlife will have absolute discretion in its decision-making, insulated

---

**3.** For convenience, in some instances, the Court has referred to Plaintiff's exhibits, where the

same material may be found in Defendant's exhibits.

from any judicial review. The *Miller* case states that a plan may require a claimant to submit medical proof of his condition. Metlife contends, properly, that this places an initial burden of proof on claimants. In this case, Laird satisfied his burden of proof. He complied with the plan requirements. He had submitted medical proof of his condition when asked before he began serving his sentence at Chillicothe.

The *Miller* case also states that an administrator may require "reasonably requested information." Even if the plan did not specify "reasonably" as a modifier of "requested information," the purpose of judicial review is to ensure that an administrator does not fall below an arbitrary and capricious standard, implying a certain level of reasonableness. For example, Metlife might be deemed to be acting arbitrarily and capriciously if it attempted to require claimants to submit medical proof of continuing disability on a monthly basis.

Thus, under *Miller*, Metlife may place an initial burden of proof on claimants, and it is not required to schedule an independent medical examination. Nonetheless, it also may not abuse its discretion. Several other courts have found that an ERISA fiduciary falls below the arbitrary and capricious standard by failing to obtain or consider evidence readily available. *See Jader v. Principal Mutual Life Insurance Co.*, 723 F.Supp. 1338 (D.Minn.1989); *Teeter v. Supplemental Pension Plan of Consolidated Rail Corp.*, 705 F.Supp. 1089 (E.D.Penn.1989); *Toland v. McCarthy*, 499 F.Supp. 1183 (D.Mass.1980). *See also Brown v. Blue Cross & Blue Shield of Alabama*, 898 F.2d 1556, 1566 n. 11 (11th Cir.1990), *cert. denied* — U.S. ——, 111 S.Ct. 712, 112 L.Ed.2d 701 (1991).[4] Owing to the circumstances here, the repeated requests for information do not meet the arbitrary and capricious standard.

■ Defendant's decision to terminate benefits represents an abuse of discretion in this particular case for three reasons. Metlife was aware of the factual basis underlying each of these reasons. None of these reasons would have applied in *Miller*, because, in that case, the claimant was not prevented by circumstances from providing medical proof and Metlife had already scheduled one independent medical examination for her.

First, Laird himself did not have the means of providing a diagnosis. The prison informed Metlife in no uncertain terms that it was not in a position to offer a diagnosis. The prison also stated that it could not compile statements from Laird's previous treating physicians, as some of them were no longer affiliated with the institution. As importantly, Laird could not have arranged for a diagnosis. Defendant has not argued that he was in a position to do so. Nothing in the record suggests that he could have done so.

Second, with the invitation from prison officials, Metlife could have obtained a diagnosis. Whatever its reasons, Metlife chose not to pursue the option. Due to its decision, the parties cannot rely on any examination or records that indicate that Laird was healthy or that he was disabled. That is, no documentation is extant which would compel a finding either way. This lack of information is noteworthy because had an examination taken place, Metlife may have been able to resolve the matter favorably to itself. Thus, a decision that Defendant acted arbitrarily and capriciously does not depend on an assumption that had an examination taken place, Plaintiff would have stood to benefit. Taking the record as a whole, it shows that Defendant was in a unique position, with a superior ability to obtain the information necessary to a determination of Plaintiff's eligibility for benefits.

Third, Plaintiff's position is strongly supported by the limited medical information

---

**4.** Even under the arbitrary and capricious standard, which defers to the fiduciary, courts are giving increased scrutiny to denial of ERISA benefits for other reasons as well. *See, e.g., Kunin v. Benefit Trust Life Insurance Co.*, 910 F.2d 534 (9th Cir.1990) (ERISA administrator abused discretion by limiting coverage for autism), *cert. denied,* — U.S. ——, 111 S.Ct. 581, 112 L.Ed.2d 587 (1990); *White v. Caterpillar, Inc.*, 765 F.Supp. 1418 (W.D.Mo.1991) (ERISA administrator abused discretion by limiting coverage for cancer treatment).

available. As discussed in a previous order, the parties do not dispute that Laird was disabled prior to entering prison and he was found to be disabled shortly after leaving prison.[5] By almost any measure, for example, under the rules of evidence, it is a reasonable conclusion that he was disabled while in prison. Two of Defendant's own internal memoranda reached a similar conclusion. In the absence of any contrary indications, it is unreasonable to assume that while Laird was at Chillicothe, he somehow improved dramatically, only to lapse back into his former condition upon completing his sentence. By making that assumption, Metlife abused its discretion.

The only arguable issue of fact surrounds communications between Metlife and Laird at the beginning of his incarceration. According to Metlife, it sent him extended disability checks for March through June of 1980, along with requests for additional medical proof of his condition. According to Laird, he never received requests as described by Metlife. The dispute is not important. As already discussed, Metlife was able to secure the necessary information, but Laird was unable to do so. Reading all inferences in favor of Metlife, even if it had requested that Laird seek an independent medical examination, its request would have been to no avail. Furthermore, the record strongly suggests that Metlife did not make sufficient efforts to contact Laird, even though it had been informed that he was incarcerated. At the time Metlife terminated Laird's benefits, it had not made an effort to determine where he was incarcerated. Metlife's computer system and files continued for some time thereafter to list Laird's home address. It was only some two years later that Metlife made any effort to locate Laird.

At oral argument, Plaintiff suggested that Metlife followed a different procedure in earlier requests for information, because even when Plaintiff had not complied immediately, Metlife did not suspend benefits. It is not necessary in reaching a conclusion that Metlife acted arbitrarily and capriciously to find that it once handled claims with greater leniency. It also is not necessary to accept Plaintiff's assertion that Metlife handled the claim in a dishonest manner, or with subjective bad faith. That assertion does not find any support in the record.

Rather, the difficulties surrounding this case are connected with Laird's incarceration. While Defendant has not argued that Plaintiff profits from prison if he prevails, "it is important to note that the case does not turn simply on Plaintiff's incarceration. The fact that he was at Chillicothe takes on importance because it affected communications between the parties and made it difficult for both of them to determine Plaintiff's medical condition. The same problems might have arisen had Plaintiff moved and become unavailable for other reasons, for example, if he were residing at another institution, serving in the military, traveling abroad or incapacitated." Order of March 12 at 11.

## IV. ATTORNEY FEES AND COSTS

 Under ERISA, recovery of attorney fees and costs is permissive rather than mandatory and rests within the sound discretion of the court. *See* 29 U.S.C. § 1132(g)(1); *Sweet v. Consolidated Aluminum Corp.*, 913 F.2d 268 (6th Cir.1990). The parties shall have twenty (20) days to file memoranda not exceeding ten (10) pages in length concerning the amount of benefits due, attorney fees and costs.

---

**5.** In addition to the determinations by the Veterans Administration and the Department of Health and Human Services, two of the six doctors whose reports were forwarded to Metlife found medical conditions that may be considered permanent disabilities. In a letter dated November 21, 1986, Dr. Norton A. Winer states that he performed a neurologic examination that revealed "a claw hand deformity on the left with pinprick hypoesthesia in the in the left ulnar nerve distribution." Aside from the laceration of tendons in the left hand, Dr. Winer states that a CAT scan demonstrated a bulging disc, leading to the conclusion that Laird suffers chronic back pain. As reported in a letter dated February 3, 1987, Dr. Philip Kazdan found a loss of vision in Laird's right eye, which he characterized as a permanent disability. Def. Ex. CC.

Plaintiff shall attach as an exhibit a summary of all attorney fees and costs.

## CONCLUSION

In conclusion, Defendant, in carrying out its duties under ERISA and the plan, did not meet the arbitrary and capricious standard. It abused its discretion. Therefore, Plaintiff's motion for summary judgment is GRANTED.[6]

IT IS SO ORDERED.

---

6. While some cases suggest that it is appropriate to remand to the fiduciary for the purpose of considering previously neglected evidence, it would not be the proper course in this matter, as the necessary information is simply unavailable. Defendant has not argued in favor of remand.