**Richard BRUCH, et al.**

v.

**FIRESTONE TIRE & RUBBER CO., et al.**

**Civ. A. No. 82–3286.**

United States District Court, E.D. Pennsylvania.

June 9, 1986.

Paula R. Markowitz, Philadelphia, Pa., for plaintiffs.

Martin Wald, Philadelphia, Pa., for defendants.

## MEMORANDUM AND ORDER

HUYETT, District Judge.

This ERISA class action arises out of the November 30, 1980 sale by Firestone Tire & Rubber Company ("Firestone") of five of its plants which, together, constituted its Plastics Division. All five plants were sold as ongoing operations to Occidental Petroleum, the Hooker Chemical Division. Of the seven original counts in the second amended complaint, five remain in this action. All five counts are the subject of the cross-motions for summary judgment which are presently pending before me. Before delving into a detailed analysis of the issues raised by each of plaintiffs' claims, I will outline briefly the facts underlying this action, the claims plaintiffs have raised, the procedural posture of the action, and the standard by which plaintiffs' claims must be evaluated.

The five plants which comprised Firestone's Plastics Divisions were located in Pottstown, Pennsylvania; West Caldwell, New Jersey; Perryville, Maryland; Salisbury, Maryland; and Baton Rouge, Louisiana and employed approximately 500 salaried employees. The six named plaintiffs are former, salaried, non-union employees who worked at the Pottstown, Pennsylvania plant. They represent four classes of

salaried, non-union individuals who were employed in Firestone's Plastics Division on the date of the sale. Following the sale, plaintiffs and most of the other employees continued, without interruption, to perform their same jobs at the same rates of pay as employees of the new owner, Occidental.

Of the five remaining claims, four are being maintained on behalf of classes; one claim is being asserted by individual named plaintiffs. In count one, plaintiffs, representing a class of all salaried employees employed in the five plants on November 30, 1980 except those employees who retired at the time of the sale or who have been paid termination pay with regard to their employment with Firestone's Plastics Division, claim that they are entitled to termination pay on the grounds that they were terminated by Firestone at the time of the sale; the sale, plaintiffs allege, constituted a reduction in force under Firestone's termination pay policies thereby entitling them to the termination pay.

Count three states a claim for redress for the difference under Firestone's Retirement Plan for Salaried Employees ("Retirement Plan") between an early retirement benefit and a deferred vested retirement benefit. Plaintiffs bring this claim on behalf of a class of all salaried, non-union employees at the five plants who did not qualify, before the date of the sale, for normal or early retirement under the Firestone Retirement Plan. In count five, plaintiffs, on behalf of a class of all salaried, non-union employees at the five plants who had non-vested accrued benefits credited to their accounts under Firestone's Stock Purchase and Savings Plan ("Stock Plan"), seek the vesting of their unvested interests in Firestone's contributions to the Stock Plan.

In count six, plaintiffs represent a class of all salaried, non-union employees who were employed in the five plants on the date of the sale who had vacation time accrued on November 30, 1980 but had not yet taken it. Plaintiffs claim that they are entitled to the vesting of credit for purposes of the Retirement and Stock Plans

for the accrued vacation time which was unused at the time of the sale. Finally, in count seven, several individual plaintiffs state a claim for breach of ERISA's reporting and disclosure requirements.

The Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.*, is a comprehensive statute designed to protect employees enrolled in pension and welfare benefit plans. ERISA provides a private right of action to any participant or beneficiary to enforce his or her rights under either a pension or a welfare benefit plan. 29 U.S.C. § 1132(a)(3)(B)(ii). Although pension and welfare benefit plans serve different purposes, ERISA subjects them to common reporting and disclosure requirements, 29 U.S.C. §§ 1021–31, and standards of fiduciary conduct, 29 U.S.C. §§ 1101–14. Welfare benefit plans, however, are not subject to ERISA's vesting provisions or minimum substantive provisions. Termination pay plans are now generally classified as "employee welfare benefit plans" within the meaning of 29 U.S.C. § 1002(1) and are, therefore, governed by ERISA.

Summary judgment may be granted only when it has been established that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Small v. Seldows,* 617 F.2d 992 (3d Cir.1980). The court does not decide issues of fact, but merely determines if there is an issue of fact to be tried. *Ettinger v. Johnson,* 556 F.2d 692 (3d Cir.1977). The facts must be viewed in the light most favorable to the non-moving party, and any reasonable doubt as to the existence of a genuine issue of fact is to be resolved against the moving party. *Continental Ins. Co. v. Bodie,* 682 F.2d 436 (3d Cir.1982).

██ Firestone was the administrator of the three plans involved in the claims raised by plaintiffs, and as such, is a fiduciary under ERISA. In reviewing a decision by the administrator of a pension or welfare benefit plan, I am limited to determining whether the administrator's actions were arbitrary and capricious. Unless the decision was arbitrary and capricious, the

administrator satisfied its fiduciary obligations under 29 U.S.C. § 1104.[1]  *See Northeast Dep't. ILGWU Health and Welfare Fund v. Teamsters Local No. 229 Welfare Fund,* 764 F.2d 147, 163 (3d Cir. 1985); *Wolf v. National Shopmen Pension Fund,* 728 F.2d 182, 187 (3d Cir.1984).

### Count One—Termination Pay

In count one, plaintiffs seek the recovery of severance or termination pay benefits to which they claim they were entitled upon the sale of the Plastics Division.  Upon divestiture of the five plants, Firestone refused to pay severance benefits, asserting that no event had occurred which gave rise to a right to such benefits.

At the time of the sale, Firestone maintained a non-funded, non-contributory severance pay benefit plan for its employees. The terms of the plan were set forth in two personnel documents.  First, the Salaried Employees Handbook, which was in effect in 1980 and which was given to each employee, provided in pertinent part:

> If your service is discontinued prior to the time you are eligible for pension benefits, you will be given termination pay if released because of a reduction in work force or if you become physically or mentally unable to perform your job.
>
> The amount of termination pay you will receive will depend on your period of credited company service.

Plaintiffs contend that the sale constituted a reduction in force.  The Handbook, however, does not provide any definition of "reduction in force."

Firestone's termination pay policies were set forth in greater detail in the Manual which was a confidential company document not generally circulated to employees, but which was, according to defendants, available for an employee to review upon request.  A reduction in force (RIF) is defined generally in the Manual as "termination by the Company, without prejudice to the employee."  Section 1.5.4.  Section 2.11.3 further states:

> Despite the objectives of Firestone to provide stable employment, continued earnings and benefit coverages to its employees, there may be economic conditions that develop which make it necessary for the Company to temporarily or permanently terminate the employment of some of its work force.
>
> In the event such release must be made, the following reduction in force policies have been established with the goal of minimizing the economic and mental stress of terminated employees during the period of time between release from Firestone and securing other employment ...

Plaintiffs contend that defendants may not properly rely on the provisions of the Manual because the language in section 2.11.3 which defendants cite in their motion for summary judgment was added to the Manual only one month before the November 30, 1980 sale.  Plaintiffs also argue that this Manual was not made available to the employees.  I note that plaintiffs, in their second amended complaint, specifically relied on provisions in the Manual to support their claim for termination benefits; it would be rather anomalous to permit plaintiffs to rely on a document while prohibiting defendants from using it to support their defense.  Nevertheless, at oral argument, defense counsel stated that defendants did not consider reliance on the Manual essential to their position.  Because I find sufficient grounds for rejecting plaintiffs' termination pay claim without reference to the Manual, I need not

---

**1.** Plaintiffs suggest that courts have developed a three-pronged test when applying the "arbitrary and capricious" standard, the three elements of which are: whether the decision of the trustees is supported by substantial evidence, whether the trustees have made an erroneous decision on a question of law, or whether the trustees have acted in bad faith.  In this circuit, the courts have not articulated such a test; rather they have simply focused on whether the decision was arbitrary and capricious without further defining that standard.  The three elements to the test plaintiffs propose are certainly factors to be considered but they alone are not determinative of whether defendants have breached their fiduciary duty.

decide whether reliance on the Manual is appropriate.

█ There is no dispute that Firestone's termination pay plan was an "employee welfare benefit plan" and as such is subject to the fiduciary and reporting and disclosure requirements of ERISA. *See* 29 C.F.R. § 2510.3–1(3). Employee welfare benefit plans, however, are not subject to the vesting and minimum substantive content provisions of ERISA. The issue that arises, therefore, is whether, in the absence of a statutory guarantee or right in an employer's termination pay plan, an employer, who has offered such a plan, may later terminate the plan without incurring liability for the previously promised benefits. Plaintiffs contend that the employer may not; employees acquire a contractual interest in welfare benefit plans enforceable under federal common law.

The court in *Adcock v. The Firestone Tire & Rubber Co.,* 616 F.Supp. 409, 414–419 (1985), facing precisely the same claim raised by plaintiffs here, held that the plaintiffs, salaried non-union employees, possessed a contractual right to benefits under the Firestone severance pay plan, a deferred and contingent right.[2] "The plan is subject to the procedural protections contained in ERISA, that is, reporting and disclosure requirements and fiduciary standards, but with substantive rights governed by common law contract principles." *Adcock* at 419.

I reach the same conclusion in this action. ERISA is silent as to the rights an employee has in welfare benefit plans; therefore, it is necessary to look to another source to determine what rights, if any, an employee has in welfare benefits. The source is federal common law. "Congress intended that a body of Federal substantive law ... be developed by the court to deal with issues involving rights and obligations under private welfare and pension plans." 120 Cong.Rec. 29942 (1974) (remarks of Senator Javits). As the court in *Adcock* emphasized, the employer-employee relationship is contractual. Benefits are part of the package for which an employee exchanges his labor. The issue here is whether the termination pay benefits are contractual rights.

█ To create a binding contract, there must be an offer and an acceptance of the offer; both acts must be supported by sufficient consideration. As in *Adcock,* in this case, the employee's Handbook states that:

> If your service is discontinued prior to the time you are eligible for pension benefits, you will be given termination pay if released because of a reduction in work force or if you become physically or mentally unable to perform your job.

This provision constitutes an offer by Firestone to pay termination benefits in the event of a reduction in work force or a mental or physical disability by the employee. Plaintiffs accepted this offer by performing their jobs, at all times subject to the terms of the Handbook. Plaintiffs, therefore, acquired a contractual interest in the termination benefits which interest is

---

**2.** In *Adcock v. Firestone,* 616 F.Supp. 409 (1985), Judge Wiseman, relied heavily on the district court's decision in *Hansen v. White Farm Equipment Corp.,* 42 B.R. 1005, 5 EBC 2130 (N.D.Ohio 1984), in which the court held that under contract principles, welfare benefit plans "vest upon retirement" and cannot be terminated even in the face of plan language which unequivocally authorizes such action. Defendants submitted for my consideration a copy of the Sixth Circuit's slip opinion in *Hansen* in which the court reversed the district court's holding. *See Hansen v. White Motor Corp.,* 788 F.2d 1186 (6th Cir.1986). Defendants argue that the Sixth Circuit, in *Hansen,* rejected a federal common law, contractual analysis. However, in *Hansen,* the Sixth Circuit merely held that contract principles do not result in the absolute vesting of employee welfare benefits and no federal policy mandates a federal common law rule limiting the right of an employer to exercise after retirement a reserved right of termination of employee welfare benefits. The *Hansen* court accepted the notion that an employee may have a contractual right in his or her welfare benefits; the court rejected the concept that federal common law should define the substantive content of the contract. "It is the district court's further conclusion that a federal rule of decision should be created barring termination of welfare benefit plans, regardless of any clear, express contractual provisions, which gives us pause." *Hansen,* slip op. at 1192.

subject to the procedural protections of ERISA. However, where the terms of the policy are susceptible to more than one reasonable interpretation, ERISA mandates that the court not substitute its judgment for that of the administrator.[3] Therefore, Firestone's interpretation of plaintiffs' rights will prevail unless it is arbitrary and capricious.

■ Relying on the court's analysis in *Blau v. Del Monte Corporation,* 748 F.2d 1348 (9th Cir.1985), plaintiffs argue that they are entitled to termination pay because defendants' administration of the plan was so flawed by ERISA violations that it was per se arbitrary and capricious to deny termination pay. In *Blau,* the court held that where defendant's administration of the plan was characterized by many ERISA violations, the lower court could not determine as a matter of law that the denial of severance pay was not arbitrary and capricious. The court found that Del Monte had not only made no attempt to comply with any of the duties imposed on a plan administrator by ERISA but also actually concealed the severance allowance policy. Moreover, in *Blau,* the termination pay plan provided that termination pay would be granted upon job elimination whenever "alternative employment opportunities are unavailable within the corporation." Del Monte nevertheless failed to apply this standard.

Although Firestone could have taken additional steps to advise plaintiffs of its policies, there is no evidence that it actively concealed its policies in the manner Del Monte had. The Handbook was available to all salaried employees, and it clearly stated that termination pay was available only in the event of a reduction in force or physical or mental disability. Moreover, prior to the sale, Firestone employees who inquired as to termination pay were told that termination pay would not be awarded at the time of the sale; management also apparently made several statements to this

effect at the public meetings held for employees prior to the sale.

As the court in *Adcock* noted, *Blau* establishes a very high threshold for determining arbitrary and capricious conduct vis-a-vis noncompliance with ERISA's procedural requirements. Even if I accept all of plaintiffs' allegations as true, I do not believe that Firestone's conduct rises to the level of culpability necessary to cross the threshold set in *Blau.*

Defendant Firestone contends that under its termination pay policy, it had no obligation to pay termination pay benefits upon the sale of an ongoing operation when its former employees were immediately employed by the successor corporation without any significant loss in earnings or benefits. After a careful review of the facts of this case, existing case law, and Firestone's own past practices, I conclude that Firestone's decision to deny plaintiffs termination pay benefits was not arbitrary and capricious and therefore not a breach of its fiduciary obligations under ERISA.

Plaintiffs' claim for termination pay is based on the theory that a reduction in force occurred when Firestone sold the five plants. No precise definition of reduction in force has been developed; therefore, the issue is whether Firestone's decision that the sale of the five plants did not constitute a reduction in force was arbitrary and capricious. In reviewing this situation, I must give deference to Firestone's decision. However, because Firestone avoided the outlay of a substantial amount of money by denying the plaintiffs termination pay, the deference I owe to that decision is reduced, and I may scrutinize the decision more closely. Nevertheless, I conclude that the decision to deny termination pay benefits was not arbitrary and capricious.

As noted, the Handbook merely states that termination pay will be available in the event of a reduction in force. The Manual

---

**3.** Plaintiffs argue that where there is an ambiguity in the plan, the contractual ambiguity must be resolved against the author of the contract. This standard conflicts directly with the deference due the administrator and the arbitrary and capricious test of ERISA and is, therefore, pre-empted by ERISA.

defines a "reduction in force" broadly as "termination by the company, without prejudice to the employee." From this language, plaintiffs argue that they were entitled to receive termination benefits unless they left the employ of Firestone as a result of their own misconduct. I do not believe that this conclusion results from the limited language included in the Handbook or the Manual.

Although these two documents provide little guidance in defining the term "reduction in force," it is noteworthy that nothing in these documents suggests that a reduction in force would occur at the time of the sale of an operation as an ongoing business. General common usage of severance pay comports with the conclusion that termination pay would not be paid to employees who remain in the same job and continue to draw the same wage after the sale of a plant as an ongoing business. These employees suffered none of the hardships normally associated with a termination or reduction in force; they had no period of unemployment without income. Plaintiffs were immediately rehired by Occidental without missing a day of work.

The case law supports Firestone's interpretation of the Termination Pay Plan. Holding that the administrators of the Plan acted in a rational and reasonable manner and in good faith in denying the plaintiffs termination pay upon the sale of a division as a going business, the court in *Sly v. P.R. Mallory & Co., Inc.*, 712 F.2d 1209, 1211 (7th Cir.1983), affirmed the lower court's conclusion that "severance pay is generally intended to tide an employee over while seeking a new job and should be considered an unemployment benefit." Similarly, the court in *Jung v. FMC*, 755 F.2d 708 (9th Cir.1985), distinguishing its earlier decision in *Blau v. Del Monte Corp.*, 748 F.2d 1348 (9th Cir.1984), held that FMC's interpretation of the plan as not providing for severance benefits upon divestiture and transfer of employment was not arbitrary and capricious. The court also noted that to allow plaintiffs to recover severance pay would, in effect, allow a windfall to them when

they retained their positions with the new owner.

Addressing Firestone's termination policy, Judge Wiseman in *Adcock v. The Firestone Tire & Rubber Co.*, 616 F.Supp. 409 (M.D.Tenn.1985), held that "continued employment with a successor corporation following the transfer of ownership, although characterized by a termination of employment with the predecessor corporation, does not constitute an involuntary reduction in work force by the predecessor corporation thereby entitling the employee to severance pay benefits." Recently, Judge Todd reached the same conclusion in *Davidson v. Firestone Tire & Rubber Co.*, No. 84–1215, slip op. (W.D.Tenn. April 21, 1986) [Available on WESTLAW, DCTU database].

> Just as an employee who is rehired no longer has a need for termination pay, an employee who never leaves his job when a Firestone division is sold as a going concern has no reasonable expectation of receiving termination payments. Put simply, the termination pay program was intended to help those employees defendant Firestone believed needed the help, and not to give windfalls to former employees who did not need the help.

*Davidson*, slip op. at 6.

Firestone's past practices have been consistent with the position it adopted in this case. Before the sale of the Plastics Division, Firestone sold plans as ongoing businesses on at least three occasions. In 1984, Firestone sold two adhesive plants, one in Detroit, Michigan and one in Trenton, New Jersey. The purchaser of the plant, in each case, agreed to hire the existing employees, and on that basis, Firestone decided not to award termination pay. Similarly, in March 1975, Firestone sold its World Bestos plant in New Castle, Indiana. Again the purchaser agreed to hire all employees, and the employees were not paid termination pay by Firestone.

Employees who were terminated at the time of the closure of the Pottstown, Pennsylvania tire plant received termination pay, but as defendants note, these employees lost their jobs. There was no new

owner to take over the plant; it ceased to operate. Therefore, plaintiffs' reliance on this episode is misplaced. Plaintiffs also rely on the fact that Firestone made payments to former employees who had worked at the Newport, Tennessee industrial products facility before Firestone sold it as a going concern. The new owner of the Newport, Tennessee plant offered benefits which were substantially less than Firestone's benefits; for example, the successor company had no pension plan at all and provided a much lower level of health insurance and other benefits. Although Firestone concluded that these employees were not entitled to termination pay, to provide partial relief from this special hardship, Firestone adopted a one-time policy applicable to the Newport plant and granted the employees a Service Recognition Award. Robinson Affidavit at ¶ 12.

As the court in *Davidson* concluded, the fact that Firestone made payments to the Newport employees does not support the argument that the refusal to pay termination benefits to plaintiffs was arbitrary and capricious. Firestone made the payments to its former Newport employees to compensate them for the significant reduction in benefits. Therefore, these employees did not receive a windfall. Although there are some differences in the benefits packages offered by Occidental and Firestone, counsel for plaintiffs was unable to elaborate on these differences at oral argument; the differences which have been identified do not strike me as significant and certainly not as great as the differences which warranted the payment of the Service Recognition Award to the Newport employees.

For all these reasons, I conclude that Firestone's decision not to pay plaintiffs and the employees they represent termination pay was not arbitrary and capricious, and defendants are entitled to summary judgment on this count.

*Count three—Retirement Benefits*

Count three states a claim for redress for the difference under Firestone's Retirement Plan for Salaried Employees between an early retirement benefit and a deferred vested retirement benefit. Under the Retirement Plan, employees who had ten years of service and had reached age 55 or had thirty years of service, qualified for early retirement; the early retirement benefit consisted of the annual retirement income reduced by .4% for each month by which the employee's retirement age was less than age 62 and .2% for each month the retirement age was less than age 50. The early retirement benefit was not a vested benefit. Defendants, therefore, concluded that any employees who had not qualified for this benefit by the time of the sale lost their right to it and could receive only a deferred vested retirement benefit.

A deferred vested retirement benefit entitles an employee, who is terminated before he or she is eligible for the early retirement benefit but who has ten or more years of credited service, to receive a pension before age 65 in an amount which will be actuarially equivalent to the amount that would otherwise have been payable at the normal retirement age 65. In other words, the deferred benefit is reduced from the amount available at age 65 at an actuarial rate. The early retirement is, therefore, more favorable for employees.

Plaintiffs claim that they are entitled to an early retirement benefit rather than a deferred vested retirement benefit, and as a result of the sale of the Plastics Division by Firestone, the early retirement benefits to which they were entitled under the Retirement Plan were improperly reduced. Plaintiffs now agree that they did not qualify for the early retirement benefits under the terms of Firestone's Retirement Plan, but they contend that they should receive the early retirement benefit because (1) the summary plan description of the relevant Retirement Plan provisions was misleading and incomprehensible to the average plan participant, in violation of section 101(a) of ERISA, 29 U.S.C. § 1021(a), which sets forth disclosure requirements and Firestone is therefore "equitably estopped" from reducing plaintiffs' retirement benefits, and (2) plaintiffs are entitled to the

early retirement benefits because they "reasonably anticipated" receiving the greater benefit and are therefore entitled to it.

The early retirement plan is set forth in detail in the May 1, 1979 Summary Plan Description.[4] Numerical examples are provided which illustrate how the benefit is reduced if the retiring employee is under 62. For instance, if the employee is 55 at the time he or she retires, the employee will receive 66.4% of his or her normal retirement pension.

On page 11 of the May 1, 1979 Summary Plan Description, there is a section cap-

tioned: "How much do you get if you should leave before retirement?" In setting forth the conditions under which an employee may receive a retirement pension if he or she leaves Firestone before becoming eligible, the Summary provides that an employee who has ten years credit upon leaving will, at the age of 55, be able to start receiving a pension. If the employee elects to start receiving the deferred vested pension before turning 65, the Summary provides that "the amount payable monthly will be reduced and will be actuarially equivalent to the amount that would otherwise have been payable at your normal

---

4. Page 7 of the May 1, 1979 Summary Plan Description states the early retirement benefit in detail as follows:

How much do you get at early retirement? You may retire from the Company before your normal retirement date if you are at least age 55 and have ten or more years' service, or if you have 30 or more years' service regardless of your age.

If you are age 62 or over

Your early retirement benefit will be calculated under the Basic Benefit Formula and the Final Average Earnings Formula—the the same manner as the age 65 normal retirement benefit—based on your service and earnings to early retirement. You will receive 100% of the greater of the two amounts. There is no reduction for the commencement of this retirement benefit between age 62 and age 65.

If you are under 62

Your benefit amount is calculated in the same manner as described above then multiplied by a percentage from this table:

| If your pension begins at: | This is your percentage: |
|---|---|
| Age 62 | 100.0% |
| Age 61 | 95.2 |
| Age 60 | 90.4 |
| Age 59 | 85.6 |
| Age 58 | 80.8 |
| Age 57 | 76.0 |
| Age 56 | 71.2 |
| Age 55 | 66.4 |

For ages less than 55, the table is appropriately extended.

(EXAMPLE: Age 60, monthly retirement benefit before reduction is $548. $548 × .90.4% = $495.39)

The reduction for the commencement of this retirement benefit before age 62 is $\frac{4}{10}$ of 1% for each month (4.8% for each year) your age at retirement is under 62. The percentage of reduction for ages under 55 continues at $\frac{4}{10}$ of 1% to age 50. Then the percentage becomes $\frac{2}{10}$ of 1% for each month (2.4% for

each year) your age at retirement is under age 50. The reduction takes into account the longer period of time over which you would be receiving benefits.

Page 11 of the May 1, 1979 Summary Plan Description deals with the deferred vested benefit and states as follows:

How much do you get if you should leave before retirement?

Your Retirement Plan can provide benefits if your service with the Company terminates before you are eligible for retirement.

If you have 10 or more years of credited service upon your termination:

You may receive a deferred vested pension calculated in the same manner as the normal retirement benefit based on your service and earnings to the date of your termination of employment. Your deferred vested pension will become payable when you reach your normal retirement age 65, or in a reduced amount before age 65.

You may request a refund of your contributions made before July 1, 1977 with interest at your termination of employment or at any time prior to payment of your deferred vested pension. However, if you do request a refund of your contributions, you will forfeit that portion of your retirement benefits attributable to your contributions with interest. The reduced benefit will not be less than that which would have accrued had you made no contributions.

You may elect that your deferred vested pension begin prior to your age 65—on the first day of any month which is after you attain age 55. However, the amount payable monthly will be reduced and will be actuarially equivalent to the amount that would otherwise have been payable at your normal retirement age 65.

If you have less than 10 years of service upon your termination: you will receive a lump sum equal to your total contributions with interest.

retirement age 65." May 1, 1979 Summary Plan Description p. 11.

Pursuant to section 102(a) of ERISA, a summary plan description must be "written in a manner calculated to be understood by the average plan participant," i.e. written in layman's language, and it must be "sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan." 29 U.S.C. § 1022(a)(1). Plaintiffs contend that the May 1, 1979 Summary Plan Description which outlines the two retirement benefits failed to meet these ERISA standards.

At oral argument, plaintiffs' counsel suggested that the alleged defects in the May 1, 1979 Summary Plan Description could have been remedied by the addition of a single sentence to the effect that actuarial reduction is different from the reduction for the early retirement benefit. Plaintiffs attempt to illustrate the misleading effect of the Summary Plan Description by including excerpts from the depositions of the class representative to the effect that they had thought that they would be entitled to the greater retirement benefit at 66.4% rather than the deferred vested retirement benefit at 40.7%. Plaintiffs also contend that the Summary should have provided examples or hypothetical questions and answers to explain the nature of or the amount of the reduction applicable to a deferred vested pension. Failure to include an explanatory sentence or otherwise to make clear the difference between the early retirement benefit and the deferred vested retirement benefit, plaintiffs contend, resulted in a misrepresentation and a violation of the disclosure requirements of ERISA and estops defendants from denying plaintiffs and the employees they represent the early retirement benefits.

■ In order to invoke the doctrine of equitable estoppel, plaintiffs must establish three elements: a misrepresentation or omission of a material fact by one party, reasonable reliance on that misrepresentation by the other party, and detriment to the other party. *Community Health Ser-*

*vices v. Califano,* 698 F.2d 615, 620 (3d Cir.1983), *rev'd on other grounds,* 467 U.S. 51, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984).

■ In their motion for summary judgment, defendants contend that the plan descriptions fully comport with the requirements of ERISA. Defendants first note that the distinction between early retirement benefits and the deferred vested retirement benefits is specifically provided for in ERISA. Section 206(a) of ERISA provides:

> In the case of a plan which provides for the payment of an early retirement benefit, such plan shall provide that a participant who satisfied the service requirements for such early retirement benefit but separated from service ... before satisfying the age requirement ... is entitled upon satisfaction of such age requirement to receive a benefit not less than the benefit to which he would be entitled at the normal retirement age, actuarially reduced under regulations prescribed by the Secretary of the Treasury.

29 U.S.C. § 1056(a). This is exactly what defendants provided in the Summary.

In response to plaintiffs' argument that there has been a misrepresentation giving rise to equitable estoppel, defendants persuasively argue that there has been no misrepresentation. I agree. The Summary was written in a "manner calculated to be understood by the average plan participant," and it is sufficiently "accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan." 29 U.S.C. § 1022(a)(1). The Summary specifically set forth the terms under which an employee would be entitled to early retirement; if he or she did not satisfy these requirements, he or she would not receive the benefit.

Furthermore, plaintiffs and the employees they represent should have been alerted to the fact that the deferred vested retirement benefit differed from the early retirement benefit even if they did not un-

derstand the concept of actuarial reduction. First, the Summary stated in clear and simple terms that an employee was eligible for early retirement only if he or she either completed thirty years of service or completed ten years of service and reached age 55 while working for Firestone. Second, the section addressing deferred vested benefits was separate from the section addressing the early retirement and was captioned "How much do you get if you should leave before retirement?"; this should have suggested to an employee that if he or she left the employ of Firestone before qualifying for an early retirement benefit, he or she would be subject to different rules. Finally, the Summary clearly provides that the deferred vested retirement benefit would be actuarially reduced from age 65 while the early retirement benefit, on the other hand, was reduced from age 62. The references to the different ages from which reductions would be made should have alerted any employee that there was a difference between the benefits. Moreover, the reduction for those less than 62 would be .4% up to age 50 while an employee, under the deferred vested benefit, could not start receiving the benefit until age 55. There is simply no basis for the argument that the May 1, 1979 Summary Plan Description did not put plaintiffs on notice that the two reductions would be different.

Similarly, I cannot accept plaintiffs' argument that the Summary was flawed because it did not include numerical examples illustrating the actuarial reduction under the deferred vested plan. Actuarial tables do change and application of the tables vary among different persons. Therefore, it may well be more misleading to include actuarial examples than to exclude them. Because I conclude as a matter of law that there was no misrepresentation, I need not reach the issues of reliance and damages.

Plaintiffs also argue that they are entitled to the early retirement benefits because they reasonably anticipated them. In support of this contention, plaintiffs rely on *Northeast Dep't. ILGWU Health and Welfare Fund v. Teamsters Local Union No. 229*, 764 F.2d 147, 163 (3d Cir.1985), in which the court struck down an escape clause in a benefit plan and noted that "one very important policy underlying ERISA is that employees enrolled in a benefit plan should not be deprived of compensation that they reasonably anticipate ..." Plaintiffs would have me conclude, in effect, that if their interpretation of the retirement plan is reasonable and it differs from defendants', plaintiffs' interpretation should govern. I reject this analysis on two grounds. First, for the same reasons that I concluded that there was no misrepresentation in the Summary, there is no basis for plaintiffs to expect that the early retirement and deferred vested benefits would be equivalent. Second, plaintiffs' theory is inconsistent with the standard of review under which I must approach this case, i.e. the arbitrary and capricious standard. *Northeast Dep't. ILGWU*, 764 F.2d at 163. Defendants' decision must be sustained unless that decision was arbitrary and capricious. I cannot defer to plaintiffs' interpretation although it is one factor to be considered.

For all these reasons I conclude that defendants are entitled to summary judgment as to count three.

*Count five—Stock Plan*

■ Count five pertains to the Stock Purchase and Savings Plan ("Stock Plan"). Plaintiffs seek the vesting of their unvested interests in Firestone's contributions to the Stock Plan; they contend that they improperly suffered the forfeiture of certain stock credited to their accounts at the time of the sale of the Plastics Division. Under the terms of the Stock Plan, for every dollar an employee invested in his account, Firestone would contribute fifty cents. There was an annual accounting system whereby the money invested by Firestone would be treated as a unit, and each unit would gradually become vested starting in year two, with full vesting occurring in year five.

If an employee was terminated, he or she was entitled to a distribution of the vested

portion of his or her stock account. If termination occurred before the fifth year, the employee forfeited his or her unvested stock unless there was a termination or "partial termination" of the Stock Plan. Plaintiffs contend that the sale and closing of the Plastics Division by Firestone constituted a partial termination of the Stock Plan resulting in their shares becoming nonforfeitable. Plaintiffs also contend that the failure of the trustees of the Plan to make a specific determination that the Stock Plan would or would not be partially terminated by the sale was a breach of their fiduciary duties and arbitrary and capricious.

ERISA provides that upon complete or partial termination of a plan, "benefits accrued to the date of such ... termination ... are nonforfeitable." 26 U.S.C. § 411(d)(3). The Stock Plan itself provides in section 12.02:

> If the Plan is terminated, or partially terminated, or upon complete discontinuance of contributions under the Plan, the rights of all affected employees to the amounts credited to such employees' accounts at the date of termination, partial termination or discontinuance, are nonforfeitable.

Plaintiffs argue first that a partial termination of the Stock Plan occurred on November 30, 1980 making their unvested interests nonforfeitable. ERISA provides no guidance as to what constitutes "partial termination" of a plan; similarly, the Stock Plan sets forth no definition of "partial termination." Most courts when addressing this issue have looked to the IRS regulations and rulings for guidance. The Treasury regulations also do not provide a precise definition of "partial termination," but the regulations do state that whether or not a "partial termination" has occurred "will be determined on the basis of all the facts and circumstances." Treas.Reg. § 1.201–6(b)(2) (1963).

When applying these regulations, the Secretary of the Treasury has focused on whether a significant percentage of the employees covered by the plan are exclud-

ed after the event in issue. *See* Rev.Rul. 81–27, 1981–1 C.B. 228. *See also Babb v. Olney Paint Co.*, 764 F.2d 240, 242 (4th Cir.1985); *Ehm v. Phillips Petroleum Co.*, 583 F.Supp. 1113, 1115 (D.Kan.1984). No specific percentage has been established as the magical figure at which a partial termination occurs, and the court in *Babb* held that what constituted a significant percentage is preeminently a matter of fact. *Babb*, 764 F.2d at 242. Defendants contend, however, that a general rule has emerged that a partial termination will be found if more than thirty percent (30%) of a plan's participants are terminated. Defendants further argue that no partial termination resulted from the sale of the Plastics Division because only 228 of the 10,500 participants, or 2%, were terminated.

Defendants' position is supported by *Babb* in which the court held that no partial termination occurred when 12.4% of the employees were terminated from the plan. The court noted that the decision to sell a division and to terminate the employees was made as a business decision in light of hard economic times and not as a means to curtail benefits to employees.

In their motion for summary judgment, plaintiffs contend that I should not look solely at the percentage of employees affected; rather, I should focus on the "hard numbers" and the other facts and circumstances particular to the case. Plaintiffs rely heavily on *Weil v. Retirement Plan Administrative Comm.*, 750 F.2d 10, 12 (2d Cir.1984), in which the court gave "great weight" to the Secretary of the Treasury's interpretation of "partial termination" but stated that the Secretary's standard was whether there had been "the dismissal of a 'significant number of employees' in connection with a major corporate event." *Id.* at 12.

In *Weil*, the court held that the lower court erred in concluding as a matter of law that there had been no partial termination and remanded for further development of the factual record. Although only 27% of the participating employees were terminated, the *Weil* court noted that when

only the employees in New York City were considered, the percentage increased to 62%. Moreover, the court focused on whether a substantial number of employees were terminated rather than a substantial percentage. It is interesting to note that the plaintiffs in *Weil* were left unemployed whereas the plaintiffs in this case continued employment with the new owner.

Plaintiffs emphasize the major corporate event language in *Weil*, and argue that emphasis should be placed on the fact that there was a major corporate event in this case; an entire division, the Plastics Division, was sold. Moreover, in *Weil*, the court looked at what happened within the single market, New York City. Plaintiffs argue that such an approach in this case reveals that 100% of the employees with unvested stock contributions in the Plastics Division were terminated, supporting the view that a partial termination occurred.

Although I agree with plaintiffs that the issue of partial termination cannot be addressed by the purely mechanical application of a substantial percentage or number test, i.e., that the significant percentage or number tests are not per se determinative, I conclude that no partial termination of the Stock Plan occurred in this case. This is not a close case like that facing the court in *Weil* where 27% of all participants in the relevant plan were dismissed; here, only 2% of the participants in the Stock Plan were affected by the sale.

In *Weil*, the court remanded for the further development of the factual record; the court suggested that the district court consider not only the percentage of employees affected but also the absolute number affected as well as the circumstances surrounding the termination, i.e., the corporate event. Termination of 27% of all participants or 104 employees taken in conjunction with the closing of the entire New York City operation could make the 27% significant and constitute a partial termination. Although Firestone's sale of the Plastics Division could be termed a major corporate event, nothing in *Weil* suggests that a major corporate event without the termination of a substantial number or percentage of the employees will constitute a partial termination. Termination of only 2% or 228 of the plan participants will simply not give rise to a partial termination. I also reject plaintiffs' suggestion that I should consider only the employees employed in the Plastics Division.

█ Plaintiffs also argue that defendants' action with regard to the Stock Plan was arbitrary and capricious because the Committee charged with administering the Stock Plan never considered the question of whether the sale of the Plastics Division would constitute a partial termination. Plaintiffs contend that the Committee was under an obligation to develop an evidentiary record and then make a "decision" regarding the issue of partial termination. Plaintiffs rely heavily on *Toland v. McCarthy*, 499 F.Supp. 1183 (D.Mass.1980), in which the court reviewed the decision of the pension plan trustees denying an employee's application for a normal pension upon early retirement.

Plaintiffs' reliance on *Toland* is misplaced. *Toland* arose from a complex factual situation in which issues of plaintiff's employment history, plaintiff's coverage by a collective bargaining agreement, and inferences about his job classification were raised. In this case, the issue was much simpler and more straightforward. Only two percent of all of the Plan participants were affected by the sale. Therefore, although the sale constituted the divestment of an entire division, it was clear that no partial termination had occurred. There was no decision to be made by the Committee, and therefore, it would have been pointless for them to meet to make a "decision," let alone to develop an evidentiary record. My comments are limited to the facts of this case. Under different circumstances, e.g. a greater percentage of affected employees, the Committee might well be under an obligation to meet and make a reasoned decision. This, however, is not that case. Accordingly, I conclude that defendants are entitled to summary judgment as to count five.

*Count Six—Vacation Credit*

■ In count six, plaintiffs seek vesting credit for purposes of the Retirement Plan and the Stock Plan for accrued vacation time which they had not yet taken at the time of the sale. Under the Firestone system, an employee accrued vacation time during one year which could be taken during the next fiscal year. Therefore, on October 31 of each year, an employee was notified of the amount of vacation time he or she had accrued which he or she could take during the twelve months starting November 1. The sale of the Plastics Division occurred on November 30, 1980 so many employees had accrued vacation time which they had not yet taken. Under the terms of the sale, Firestone reimbursed Occidental for the vacation pay due to the employees so they actually received the vacation time during the eleven months following the sale, but they forfeited the vacation credit for purposes of the Retirement and Stock Plans. Plaintiffs claim that Firestone violated section 202(a)(3)(C) of ERISA, 29 U.S.C. § 1052(a)(3)(C), and 29 C.F.R. § 2530.200b–2(a)(2) by not counting plaintiffs' accrued vacation time for purposes of computing their vested interests under the Retirement and Stock Plans.

Plaintiffs contend that the regulations require that they be credited for each hour for which they were paid by Firestone on account of a period of time during which no duties were performed for a reason such as vacation.[5] Because Firestone admits that it paid Occidental to provide plaintiffs with the vacation they accrued before the sale, plaintiffs contend that they are also enti-tled to the credit for these vacations. Plaintiffs contend that the regulations expressly state that the fact that the employment relationship has terminated makes no difference to the application of the credit regulation.

In their motion for summary judgment, defendants contend that they were justified in denying the credit on the basis of the elapsed time method of calculating credit; use of this method, defendants argue, was not arbitrary or capricious. Defendants argue that ERISA has approved two methods of calculating employee service for purposes of vesting. The first method is that upon which plaintiffs rely, hours of service. The second method is the elapsed time method under which an employee receives credit for the entire period of time that the employment relationship exists. Under this method, the starting point for crediting service is the "employment commencement date," and the end point is the date on which the employee retires, dies, quits or is discharged.

For both the Retirement Plan and the Stock Plan, Firestone uses the hours of service method to determine eligibility or participation in the Plan and the elapsed time method for determining vesting. Under the latter, plaintiffs are not entitled to credit for the vacation time they had accrued but not taken for vesting purposes under the Retirement and Stock Plans.

The elapsed time method was authorized originally by regulations promulgated by the Department of Labor and later revised and promulgated by the Treasury Depart-

---

5. § 2530.200b–2 Hour of service.

(a) *General rule.* An hour of service which must, as a minimum, be counted for the purposes of determining a year of service, a year of participation for benefit accrual, a break in service and employment commencement date (or reemployment commencement date) under sections 202, 203 and 204 of the Act and sections 410 and 411 of the Code, is an hour of service as defined in paragraphs (a) (1), (2) and (3) of this section. The employer may round up hours at the end of a computation period or more frequently.

(1) An hour of service is each hour for which an employee is paid, or entitled to payment, for the performance of duties for the employer during the applicable computation period.

(2) An hour of service is each hour for which an employee is paid, or entitled to payment, by the employer on account of a period of time during which no duties are performed (irrespective of whether the employment relationship has terminated) due to vacation, holiday, illness, incapacity (including disability), layoff, jury duty, military duty or leave of absence. Notwithstanding the preceding sentence.

29 C.F.R. § 2530.200b–2

ment (26 C.F.R. § 1.410(a)–7) and approved by the court in *Swaida v. I.B.M. Retirement Plan,* 570 F.Supp. 482, 488 (S.D.N.Y.), *aff'd,* 728 F.2d 159 (2d Cir.1984), *cert. denied,* 469 U.S. 874, 105 S.Ct. 232, 83 L.Ed.2d 161 (1984). In *Swaida,* plaintiff sought a judgment declaring IBM's use of the elapsed time method for computing service for vesting credit under its retirement plan, a violation of the vesting standards of ERISA. The court, holding that the elapsed time regulations promulgated by the Department of the Treasury were a product of a proper exercise of its delegated authority, declined to issue such a judgment.

Similarly, I conclude that Firestone's use of the elapsed time method to determine vesting of plaintiffs' retirement benefits and stock plan accounts was neither arbitrary nor capricious. Use of this method is supported both by the legislative history and the applicable Labor and Treasury regulations. I, therefore, conclude that defendants are entitled to summary judgment as to count six.

*Count Seven—Disclosure*

In count seven of the second amended complaint, several individual plaintiffs seek monetary relief pursuant to section 502(c) of ERISA, 29 U.S.C. § 1132(c), for violations by defendants of ERISA's disclosure requirements. Plaintiffs claim (1) that Firestone failed to comply with certain disclosure and filing obligations set forth in section 104 of ERISA, 29 U.S.C. § 1024, with regard to its Termination Pay Plan,

Retirement Plan, and Stock Plan (Complaint ¶¶ 87–90), and (2) that they are entitled to discretionary damages under section 502(c) of ERISA because of Firestone's alleged failure to respond properly to their written requests for information concerning the Retirement Plan and the Stock Plan (Complaint ¶¶ 91–93). In their motion for summary judgment, plaintiffs add a claim based on Firestone's alleged failure to respond properly to written requests for information about the Termination Pay Plans; this claim had not previously been raised. I will address plaintiffs' claims *seriatim.*

First, with respect to plaintiffs' claim pursuant to section 104, 29 U.S.C. § 1024, and the so-called "automatic" disclosure and filing requirements, ERISA provides no private cause of action for monetary damages for violation of these provisions.[6] Section 502(c), 29 U.S.C. § 1132(c), sets forth the limited remedies available to private plaintiffs for violation of ERISA's disclosure and filing requirements, and this section applies only when and if a plan administrator refuses to comply with a written request for information.[7] Accordingly, plaintiffs do not have a cause of action for damages for Firestone's alleged failure to comply with the automatic provisions. Plaintiffs apparently recognized this fact as they dropped reference to this claim in their motion for summary judgment.

---

**6.** Section 104(b)(4) of ERISA, 29 U.S.C. § 1024(b)(4), provides:

(4) The administrator shall, upon written request of any participant or beneficiary, furnish a copy of the latest updated summary plan description, plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated. The administrator may make a reasonable charge to cover the cost of furnishing such complete copies. The Secretary may by regulation prescribe the maximum amount which will constitute a reasonable charge under the preceding sentence.

**7.** Section 502(c) of ERISA, 29 U.S.C. § 1132(c), provides:

(c) Administrator's refusal to supply requested information.

Any administrator who fails or refuses to comply with a request for any information which such administrator is required by this subchapter to furnish to a participant or beneficiary (unless such failure or refusal results from matters reasonably beyond the control of the administrator) by mailing the material requested to the last known address of the requesting participant or beneficiary within 30 days after such request may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $100 a day from the date of such failure or refusal, and the court may in its discretion order such other relief as it deems proper.

The next issue is whether plaintiffs are entitled to damages pursuant to section 502(c) for Firestone's alleged failure to respond to information requests. As I noted at the outset, plaintiffs had not previously claimed that defendants had failed to comply with requests for information regarding the termination pay plans. However, because I believe that there are other grounds for denying plaintiffs' claims, I will not rely on this procedural basis for the denial.

Section 104(b)(4) of ERISA, 29 U.S.C. § 1024(b)(4), imposes a duty on a plan administrator to respond to written requests for information about the plan. However, pursuant to section 104(b)(4), the plan administrator is obligated to respond only to requests from a plan participant or beneficiary. Defendants contend that the three plaintiffs who have been identified as having made requests to which there were allegedly no adequate responses ever made, Smolinski, Schade, and Bruch, were not participants in or beneficiaries of the relevant plans at the times they made their respective requests, and therefore, were owed no responses under section 104(b)(4). Moreover, defendants contend that Smolinski, Schade, and Bruch have not established that they were harmed by the lack of response to their inquiries.

A "participant" under ERISA is "any employee or former employee . . . who is or may become eligible to receive a benefit of any type from an employee benefit plan" while a "beneficiary" is "a person designated by a participant, or by the terms of an employee benefit plan, who is or may become entitled to a benefit thereunder." 29 U.S.C. § 1002(7) and (8).

Smolinski and Schade were at one time participants in the Termination Pay Plan; they could potentially have become eligible for termination pay if they were "terminated" as that term was defined for purposes of the Plan. However, because they were

no longer associated with Firestone, in 1981, when they made their requests, Smolinski and Schade, would not become eligible in the future for termination pay. Similarly, as I have ruled above, plaintiffs were not presently eligible for termination pay at the time of the sale because the sale of the plants as ongoing operations did not constitute a reduction in force. In addition, both Smolinski and Schade received letters in response to their letters in which they were advised that they were not eligible for termination because they had continued employment with Occidental. I also note that plaintiff Smolinski received four detailed letters with various enclosures in response to his request for information about the Retirement Plan.

Plaintiff Bruch contends that he never received a response to his written request for information about the Stock Purchase Plan. Bruch made his request on May 4, 1981, five months after the sale and five months after he ceased working for Firestone. Although plaintiff continued to be a participant in the Retirement Plan because of his vested retirement interest, he ceased to be a participant in the Stock Plan at the time of the sale. He received distribution of his vested interest and his unvested interests were forfeited. Thus, he did not have a contingent right to "receive a benefit" from the Stock Plan after November 30, 1980.[8]

Finally, although it has not been clearly established that a plaintiff, to prevail on a claim under § 502(c) of ERISA, must establish prejudice, I believe it is relevant that plaintiffs have not presented any evidence to show that they have sustained any harm from defendants' alleged failure to respond to their requests for information. For all these reasons I do not believe that plaintiffs are entitled to an award of discretionary damages pursuant to section 502(c),

8. Even if I had concluded that plaintiffs were entitled to have their unvested shares in the Stock Plan vested because there had been a partial termination of the Stock Plan, my conclusion with respect to Bruch's disclosure claim would not change. Bruch's rights in the Stock Plan were determined as of the date of the sale; he had no remaining interest in the Plan thereafter.

and I shall enter judgment for defendants on count seven.

An appropriate order follows.