Lawrence SCHWARTZ, James A. Schultz and William Gallagher, Plaintiffs-Appellants,

v.

NEWSWEEK, INC., Defendant-Appellee.

No. 1137, Docket 87–7030.

United States Court of Appeals, Second Circuit.

Argued April 30, 1987.

Decided Sept. 2, 1987.

Joel Field, New York City (Marian C. Burnbaum, of counsel), for plaintiffs-appellants.

Michael Delikat, New York City (Herbert J. Levine, Baer Marks & Upham, of counsel), for defendant-appellee.

Before FEINBERG, Chief Judge, and KEARSE and WINTER, Circuit Judges.

WINTER, Circuit Judge:

Plaintiffs, former employees of Newsweek, Inc., brought this action to challenge Newsweek's failure to grant them severance benefits when they separated from Newsweek and accepted employment with a successor publisher. The district court granted summary judgment in favor of Newsweek, 653 F.Supp. 384. We affirm on the ground that Newsweek's decision was neither arbitrary nor capricious and therefore did not violate the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001–1461 (1982).

The following facts are undisputed. In 1980, Newsweek, Inc. began publication of a new monthly magazine, *Inside Sports*. Plaintiffs Lawrence Schwartz, William Gallagher and James Schultz were employed by Newsweek in various staff positions at *Inside Sports* and received yearly salaries ranging from $33,800 to $47,000. Rumors of financial difficulties at *Inside Sports* began circulating as early as April 1981. At an *Inside Sports* staff meeting that November, Newsweek President Mark M. Edmiston announced that Newsweek was attempting to sell *Inside Sports*. Active Markets, Inc., a Seattle-based publishing company, entered into negotiations with Newsweek, and on January 8, 1982, Edmiston issued a memorandum announcing an "agreement in principle" with Active Markets for the sale of *Inside Sports*.

Newsweek thereupon informed *Inside Sports* staff members that they would be invited to apply for employment with Active Markets and that any staff members not interested in such employment would be given assistance in finding other positions at Newsweek. In early January, Newsweek's director of personnel, Bruce Wallin, explained the proposed severance arrangements to the *Inside Sports* staff. Those accepting employment with Active Markets would not be eligible for severance pay from Newsweek, unless their employment with Active Markets terminated within three months of their hiring date. Employees who did not wish to join Active Markets and who also failed to obtain other

suitable positions at Newsweek would be terminated and given severance pay.

By letters dated January 28, 1982, Wallin detailed the available options to each of the plaintiffs. The three plaintiffs subsequently accepted offers from Active Markets at salaries equal to or greater than their previous salaries at Newsweek.[1] Plaintiffs performed the same work for Active Markets as they had for Newsweek and worked in the same offices, now rented from Newsweek by Active Markets. None of the plaintiffs received severance or dismissal pay from Newsweek. In November 1982, about nine months after plaintiffs commenced their new employment, Active Markets halted publication of *Inside Sports* and declared bankruptcy. Plaintiffs were terminated and given two weeks' severance pay by Active Markets.

On January 26, 1983, plaintiffs wrote to Newsweek and for the first time demanded severance benefits from Newsweek. Newsweek denied their request, and plaintiffs began the instant action in the Southern District of New York. Their complaint alleged that Newsweek's failure to grant them severance benefits at the time they had voluntarily left Newsweek's employ was a violation of Newsweek's severance policy, alternatively actionable under ERISA and various state common law theories. After completion of discovery, Newsweek moved for summary judgment, a motion granted in its entirety by the district court. Plaintiffs pursue only the ERISA claim on appeal.

■ The parties agree that Newsweek's unfunded severance pay policy constitutes an "employee welfare benefit plan" within the meaning of ERISA, 29 U.S.C. § 1002(1) (1982), and that state statutes and remedies are thus preempted. *See Gilbert v. Burlington Indus., Inc.,* 765 F.2d 320, 324–26 (2d Cir.1985), *aff'd without opinion,* ——

U.S. ——, 106 S.Ct. 3267, 91 L.Ed.2d 558 (1986).[2] As the administrator of the plan, Newsweek was a fiduciary. 29 U.S.C. §§ 1002(14), (16). ERISA provides that "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and ... in accordance with the documents and instruments governing the plan." 29 U.S.C. § 1104(a)(1). In actions challenging the denial of benefits under an ERISA plan, review is limited to determining whether the administrator's decision was arbitrary and capricious. *Morse v. Stanley,* 732 F.2d 1139, 1145 (2d Cir.1984); *Miles v. New York State Teamsters Conference Pension & Retirement Fund Employee Pension Benefit Plan,* 698 F.2d 593, 599 (2d Cir.), *cert. denied,* 464 U.S. 829, 104 S.Ct. 105, 78 L.Ed.2d 108 (1983).

The district court found that the severance benefit policy applicable to all *Inside Sports* staff members, including plaintiffs, was set forth in the collective bargaining agreement between Newsweek and The Newspaper Guild of New York (the "Guild Contract"). Specifically, Article XX of the Guild Contract, entitled "Sale of Operating Unit," provided that:

> An employee who is dismissed because of the sale by the Publisher of Newsweek magazine or any other operating division or department of the Publisher and who is not offered employment by the purchaser of the magazine or other division or department, or who accepts such employment but is dismissed by the purchaser within three months after such employment commences, shall receive the dismissal pay provided by Section 1 of Article VIII, the notice provided by Section 4 of Article IX and the reduction in force pay provided by paragraph i of Section 5 of Article IX. Except as provided by this Section, no Employee

---

1. Article IX of the Purchase and Sale Agreement between Newsweek and Active Markets required Active Markets to offer employment to *Inside Sports* staff members, including plaintiffs, who desired it.

2. In letter briefs to this Court, both parties have agreed that the Supreme Court's recent decision in *Fort Halifax Packing Co. v. Coyne,* —— U.S.

——, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987) is not relevant to this appeal. In *Fort Halifax Packing,* the Court adopted the holding of *Burlington Industries* that an employer severance pay plan such as that in place at Newsweek, which pays benefits on an ongoing basis to employees severed under certain circumstances, is an "employee welfare benefit plan" under ERISA. *See id.* 107 S.Ct. at 2220–21 & n. 10.

dismissed because of the sale of Newsweek magazine or any other division of the Publisher shall receive dismissal pay, notice or reduction in force pay from the Publisher.

Under the terms of the Guild Contract, plaintiffs would of course have no right to severance benefits. The Guild Contract itself did not cover all Newsweek employees, however, because some staff members, including plaintiffs, were not part of the collective bargaining unit. We thus agree with plaintiffs that the provisions of the Guild Contract are not dispositive of this case.

Plaintiffs argue instead that their rights to severance benefits are governed by Section X of Newsweek's Supervisor's Manual. The Manual consisted of policy guidelines applicable to supervisory personnel such as the plaintiffs. Section X provided formulae for calculating dismissal pay, notice pay and reduction-in-force pay that were identical to the formulae contained in the Guild Contract. Unlike the Guild Contract, however, Section X made no specific provision for severance eligibility in the event of the sale of an operating unit but merely stated that "[a]n employee who has been dismissed for any. reason other than gross misconduct shall receive dismissal pay...."

On appeal, plaintiffs do not contend that the Manual is unambiguous as to their right to severance benefits in the circumstances of their separation from Newsweek. Instead, they argue that, precisely because Section X is ambiguous, a material issue of fact as to Newsweek's severance policies exists and summary judgment was improper. We disagree. Under ERISA, the issue is not the precise meaning of the Manual, but whether Newsweek's denial of severance benefits to plaintiffs was arbitrary and capricious.

■ Under that standard, Newsweek's severance policy clearly passes muster for the following reasons: (1) it was publicly announced; (2) it neither deceived the plaintiffs nor defeated their reasonable expectations; (3) it treated all Newsweek employ-ees uniformly; (4) it was a reasonable interpretation of the Supervisor's Manual; and (5) it was sensible.

Most of the decisions that have addressed similar denials of severance pay have arisen in circumstances in which the company had been silent as to whether severance benefits were payable when a division was sold. *See, e.g., Holland v. Burlington Indus., Inc.,* 772 F.2d 1140, 1149 (4th Cir.1985), *aff'd without opinion,* — U.S. ——, 106 S.Ct. 3267, 91 L.Ed.2d 559 (1986); *Jung v. FMC Corp.,* 755 F.2d 708, 712 (9th Cir.1985) ("Nothing in the Policy Guide refers to a termination resulting from the sale of a business."); *Sly v. P.R. Mallory & Co., Inc.,* 712 F.2d 1209, 1212–13 (7th Cir.1983). In this case, however, Newsweek informed plaintiffs through written and oral announcements in January 1982 of a severance policy providing that *Inside Sports* staff members who accepted employment with Active Markets would be ineligible for severance pay unless they were dismissed within three months after commencing such employment. Each plaintiff thus was given the option of: (1) accepting employment with Active Markets and losing Newsweek's severance benefits or (2) seeking continued employment with Newsweek and receiving severance benefits if that employment could not be arranged. Each plaintiff voluntarily accepted employment with Active Markets. Newsweek's denial of plaintiffs' severance pay therefore neither deceived the plaintiffs nor defeated their reasonable expectations.

Another factor supporting Newsweek's denial of severance benefits is the fact that it was consistent with the manner in which other employees were treated. By offering the severance benefits available under the Guild Contract to nonunion employees, Newsweek adopted a uniform policy for all employees. "Evenhandedness of treatment is evidence of good faith." *Anderson v. Ciba-Geigy Co.,* 759 F.2d 1518, 1522 (11th Cir.), *cert. denied,* 474 U.S. 995, 106 S.Ct. 410, 88 L.Ed.2d 360 (1985); *see also*

*Paris v. Profit Sharing Plan for Employees of Howard B. Wolf, Inc.*, 637 F.2d 357, 362 (5th Cir.), *cert. denied*, 454 U.S. 836 102 S.Ct. 140, 70 L.Ed.2d 117 (1981). The fact that the Guild Contract was the result of arms-length bargaining is an additional demonstration of the reasonableness of the policy.

The severance provisions in the Supervisor's Manual support Newsweek's position. The Manual is a "document" that "governs" Newsweek's plan, *see* 29 U.S.C. § 1104(a)(1)(D) (1982), and it was entirely within Newsweek's discretion to interpret Section X's concededly ambiguous language as it did. *See Gordon v. ILWU–PMA Benefit Funds*, 616 F.2d 433, 439 (9th Cir.1980) (where provisions of document governing plan "are susceptible to more than one reasonable interpretation, the court may not substitute its judgment for that of the [fiduciary]"). Plaintiffs argue that ambiguities in the Manual should be construed against the drafter. Resort to such a canon of construction in the context of employee benefit plans under ERISA is entirely inappropriate, however, because it would "conflict[ ] directly with the deference due the administrator and the arbitrary and capricious test of ERISA...." *Bruch v. Firestone Tire & Rubber Co.*, 640 F.Supp. 519, 524 n. 3 (E.D.Pa.1986); *see also Jung v. FMC Corp.*, 755 F.2d 708, 713 (9th Cir.1985).

Finally, Newsweek's interpretation of its severance plan reflected sensible concerns.[3] As the district court observed, a recovery by plaintiffs in these circumstances would reduce the incentives for employers to attempt to secure positions for employees with the purchaser of a division when those employees might well prefer such employment over a relatively small amount of severance pay. Such a narrowing of the options available to employees in a saleable division runs counter to a central purpose of ERISA. *See DeAngelis v. Warner Lambert Co.*, 641 F.Supp. 467, 469 (S.D.N.Y.1986) ("ERISA was enacted to improve the equitable character ... of private employee benefit plans....") (citing H.R.Rep. No. 533, 93d Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Ad.News 4639, 4655). We also note that plaintiffs did receive severance pay from Active Markets. "To award severance benefits under these facts would result in a windfall to the employees who retained their positions with the purchaser of the going concern, which was clearly not the intention or goal ... of ERISA." *Sly v. P.R. Mallory & Co.*, 712 F.2d 1209, 1211 (7th Cir.1983) (quoting unpublished district court opinion in same case); *see also Jung v. FMC*, 755 F.2d at 714.

Because Newsweek's denial of severance benefits was neither arbitrary nor capricious whatever meaning is given to the Supervisor's Manual, we affirm the judgment of the district court.

---

**3.** A factor to be considered in determining the reasonableness of a denial of benefits is the employer's practice in previous sales of divisions. *See, e.g., Sly v. P.R. Mallory & Co., Inc.*, 712 F.2d 1209, 1213 (7th Cir.1983) (observing that denial of severance benefits to employees who accepted comparable positions with purchaser of their division was consistent with employer's prior practice in such situations); *Anderson v. Ciba-Geigy Co.*, 759 F.2d at 1522 (same). *But see Blau v. Del Monte Corp.*, 748 F.2d 1348, 1356 (9th Cir.1984) (declining to "reward Del Monte's past practice of denying severance benefits" in similar situations because this interpretation was arbitrary and capricious from beginning). In this case, Newsweek had never before faced a similar situation. In Newsweek's only previous sale of a publication—the sale of *Art News* in 1972—the purchaser had expressly declined to hire any of Newsweek's employees.